UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EXPERIAN MARKETING SOLUTIONS, INC.,

       Plaintiff,

                                      File No.  1:15-CV-476

v.

                                      HON. ROBERT HOLMES BELL

JEREMY LEHMAN,
THORIUM DATA SCIENCE, LLC,

       Defendants.

_____/

## OPINION

     This is an action for (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq.; (2) misappropriation of trade secrets under the Michigan Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. Laws § 445.1901; (3) breach of contract; (4) breach of fiduciary duty; and (5) tortious interference with contract.

     Plaintiff Experian Marketing Solutions, Inc. ("Experian") is a marketing-services company based in Illinois.  Defendant Jeremy Lehman is a former employee of Experian residing in Grand Rapids, Michigan.  Defendant Thorium Data Science, LLC ("Thorium") is an entity created by Lehman.  Before the Court is Experian's motion for a preliminary injunction.  The parties have briefed the motion and the Court conducted a hearing on June 9, 2015.  The motion for a preliminary injunction will be GRANTED in part and DENIED in part, as set forth below.

## I.

According to the verified complaint and its attachments, Experian hired Lehman in July 2011 as an Executive Vice President for Global Product Development and Delivery. (Compl. ¶ 30, ECF No. 1.)  Lehman created the "Data Science Division" of the Global Product Development and Delivery department and hired Trevor Watkins to lead it.  (*Id.* ¶ 35.)  Lehman's other subordinates included Anna Thomas, Gordon Cowie, Sergey Vladimirov, Amir Behrozi, Salar Ghahary, Mark Frisch, Sarah Litt, and Monika Jakober. Plaintiff asserts that Lehman had access to "confidential and proprietary information" in connection with his employment, "including but not limited to global business plans, proprietary technologies and source codes." (*Id.* ¶ 3.)  Among other things, Watkins and Lehman developed a "cross channel marketing platform that measured marketing attribution." (*Id.* ¶ 36.)  "The marketing response attribution program informs [Experian] clients of how successful their email and digital marketing efforts are in driving customers to visit their websites and/or physical stores." (*Id.*.)  Lehman also assisted with the acquisition of Conversen, a cross-channel marketing platform developed by Vladimirov. (*Id.* ¶ 37.)

Employment and Settlement Agreements

As a condition of his employment, Lehman entered into an employment agreement with Experian ("Employment Agreement").  (*See* Ex. 1.)[1]  Section 6 of the Employment

---

[1]For any exhibit attached to the complaint, the Court will refer to it as "Ex. [number]."

Agreement addresses the use/disclosure of confidential information:

> During and after my employment with Experian, I will not (a) disclose, directly or indirectly, any Confidential Information to anyone outside of Experian or to any employees of Experian not authorized to receive such information; (b) use any Confidential Information other than as may be necessary to perform my duties at Experian; or (c) take any action that may result in the prohibited use or disclosure of Confidential Information.  In no event will I disclose any Confidential Information to, or use any Confidential Information for the benefit of, any current or future competitor, supplier or client of Experian, whether on behalf of myself, any subsequent employer, or any other person or entity.

(*Id.*)  "Confidential Information" is defined as "all information that Experian desires to

protect and keep confidential"; it includes trade secrets as well as

> . . . information compiled and maintained on the Experian databases or provided by third parties . . . to Experian for list processing, list maintenance, data overlay, lettershop or other services provided or arranged by Experian; computer programs; unpatented inventions, discoveries and improvements; marketing, manufacturing, organizational, operating and business plans; strategic models; research and development; Experian policies and manuals; sales forecasts; personnel information (including the identity of Experian employees, their responsibilities, competence and abilities, and compensation) . . . .

(*Id.*)

> Section 11 of the Employment Agreement imposed certain restrictive covenants on

Lehman, including the following:

> (a) <u>Non-Solicitation of Employees</u>.  While employed by Experian and for a period of twelve (12) months following termination of my employment with Experian for any reason, including termination by Experian with or without cause, I agree that I will not directly or indirectly solicit, induce or encourage any Experian employee(s) to terminate their employment with Experian or to accept employment with any competitor, supplier or client of Experian, nor shall I cooperate with any others in doing or attempting to do so. As used

herein, the term "solicit, induce or encourage" includes, but is not limited to, (i) initiating communications with an Experian employee relating to possible employment, (ii) offering bonuses or additional compensation to encourage Experian's employees to terminate their employment with Experian and accept employment with a competitor, supplier or client of Experian, or (iii) referring Experian's employees to personnel or agents employed by competitors, suppliers or clients of Experian.

. . .

(c) <u>Non-Competition</u>. While employed by Experian and for a period of twelve (12) months following termination of my employment for any reason, except termination by Experian without cause, I agree that I will not, directly or indirectly . . . engage in, solicit or perform any work competitive with any Experian line of business for which I have performed work within the last 12 months or for which I possess or have access to Confidential Information.

(*Id.*)

On March 12, 2014, Experian notified Lehman that his position would be eliminated effective July 1, 2014, due to a reduction in force. Lehman subsequently signed a Separation Agreement and General Release ("Settlement Agreement") in return for $250,000 and a pro-rated payout of his stock option grants. (Settlement Agreement, Ex. 4.) The Settlement Agreement expressly incorporates the restrictive covenants of the Employment Agreement (including the non-competition, non-solicitation, and confidential information restrictions). In addition, Lehman agreed to return all Experian property in his possession upon his termination, to not use or disclose any of Experian's "confidential and/or proprietary information" and to not "act in any manner that might damage the business or reputation of Experian." (*Id.* ¶¶ 3, 7, 8, 10.)

<u>Investigation of Lehman's Conduct</u>

Lehman's employment ended on June 30, 2014. Sometime thereafter, Plaintiff discovered that when Lehman returned his laptop computer to Experian, he did not return the hard drive. When Plaintiff finally received the hard drive from Lehman in November 2014, following several requests to return it, Plaintiff discovered that the contents of the drive had been erased. After further investigation, Plaintiff learned that Lehman had been communicating with Experian employees about a new business venture, was engaging in competitive activity, and had either retained some of Experian's confidential information following his departure, or obtained it from Experian employees.

A number of Experian employees were terminated in early January 2015, due to their connection with Lehman. That same month, Plaintiff sent Lehman a cease-and-desist letter accusing him of engaging in competitive activity, soliciting Experian employees, and failing to return Experian's property and confidential information. (Ex. 5.) The letter asked Lehman to cease competition with Experian until "no earlier than June 30, 2015," to stop soliciting Experian employees to work for Thorium until "no earlier than June 30, 2015," and to return all Experian materials, including confidential information. (*Id.*)

In February and March 2015, Lehman allegedly turned over several of his personal electronic devices, including his desktop computer, for inspection by Plaintiff. As a result of Plaintiff's internal investigation and its inspection of Lehman's devices, it discovered additional documents and emails to or from Lehman suggesting that he had violated, or was

violating, the restrictive covenants in the Employee Agreement and the Settlement Agreement.

Plaintiff's complaint is based, in part, on Lehman's alleged breach of the restrictive covenants in the Employment Agreement and the Settlement Agreement. Plaintiff also claims that Defendants engaged in tortious interference of contract and misappropriated Plaintiff's trade secrets. Many of the emails and documents uncovered as a result of Plaintiff's investigation are attached to the complaint in support of Plaintiff's claims.

Formation and Development of Thorium

Based on the evidence provided by Plaintiff, it appears that Lehman started planning a new business venture (later known as Thorium) as early as March 2014, when he drafted a document identifying potential clients and a "team" of contributors that would include Experian employees Watkins, Vladimirov, Behrozi, Thomas, Frisch, Cowie, and others. (Ex. 11.) In April, he drafted a document for a "team" meeting on April 22 with Ghahary as a participant. (Ex. 12.) That same month, Ghahary registered the domain name "thorium3.com," which was used by members of Lehman's "team" to communicate about matters related to Thorium.

In June, Hewlett-Packard ("HP") held a conference in Las Vegas focused on its Vertica software platform, which is not used by Experian. On May 28, 2014, Thomas emailed Lehman, Watkins, Cowie, and Behrozi to discuss a product proposal for the conference, a draft website for Thorium, business cards, and a goal that all participants would

become certified on HP's Vertica software.  (Ex. 16.)  Plaintiff alleges that Watkins, Cowie, Behrozi, Thomas and other Experian employees attended the conference with Lehman. Several weeks later, Lehman prepared a document detailing next steps for Thorium following the HP conference (Ex. 24), and sent it to Behrozi, Ghahary, and Cowie, along with notes for an upcoming meeting with IIS (a vendor of Experian) in New York (Ex. 25).

On June 19, Lehman filed articles of incorporation for Thorium Data Science, LLC. (*See* Ex. 15.)  His last day of employment with Experian was June 30, 2014.

Competitive Activity and Disclosure of Information

In July 2014, Ghahary sent Lehman a Powerpoint presentation which contained allegedly confidential screenshots of the user interface for Plaintiff's marketing software. (Compl. ¶ 152; *see* Ex. 41.)  Lehman asked whether the graphics in slides 4 and 12 of the presentation are "directly or partially from Experian" and "if so, we need to rework please." (Email, Ex. 42.)  Ghahary confirmed that they were, and sent Lehman a new version. Nevertheless, Lehman sent the original version to a representative of HP on September 15, to provide "context on [Thorium]."  (Ex. 43.)  Lehman sent it to another HP employee on December 8, 2014.  (Ex. 45.)

By the fall of 2014,  Lehman and his "team" had apparently decided to offer their services to develop a marketing attribution product for IIS and HP, aided by their knowledge of Experian's product and their access to Experian's internal documents.  In October, Lehman emailed Watkins and Thomas, stating that "Attribution is a Thorium

initiative . . . Do we have some way for you to see the Experian product?" (Ex. 29.) The following day, 147 ".java" files containing Experian's confidential source code and algorithm for its attribution product were allegedly copied to Lehman's desktop computer. (Compl. ¶ 132.) Lehman contends that these files may have been copied to a shared Google Drive, which would have automatically copied the files to his computer, but he was not aware of them and he did not use or access them. (Lehman Decl. ¶¶ 11-12.)

On October 10, Lehman emailed Watkins, stating, "On marketing attribution, we need to first reassure [IIS representatives] that we know the space well. . . . Do we have more detailed docs from Experian that we can share with them?" (Ex. 32.) In a follow-up email, Lehman told him, "Just a reminder that sharing docs on the Experian solution is one step to reassuring them that we know the space well." (Ex. 33.) Watkins sent him some documents, telling him to "sift[] through and pick[] what you want to send on[.]" (*Id.*) Later that day, Lehman sent four documents by email to IIS; one is an explanation of "Statistical Attribution," and it contains algorithms and examples for measuring attribution. (Ex. 34.) The other document is titled "Response Attribution Explained"; it provides information and examples about how attribution is used. (*Id.*) Lehman also sent the Response Attribution Explained document to an employee at HP. (Ex. 36.) Plaintiff claims that these documents contain confidential information and trade secrets about its attribution product.

When sending the "Statistical Attribution" and "Response Attribution Explained" documents to IIS, Lehman wrote:

> Hi, here's some information on the product the team created prior to Thorium. . . .
>
> To be clear, these apply to the Experian product the team built. We are very careful to separate Experian IP. We will not use any prior art and will create an entirely new and different system. . . .
>
> Experian built their attribution package to work with their Cross Channel Marketing Platform. They also dialed back the quantitative sophistication for backwards compatibility with earlier products (they use fractional, not statistical attribution in the production version). *We're free of these constraints and can build a new and better product.*

(Ex. 34 (emphasis added).)

When sending the "Response Attribution Explained" document to an employee at HP,

Lehman told her:

> We discussed building three solutions with HAVEn to drive adoption in vertical industries. *For digital marketing, we'll build on our prior experience with response attribution*, which quantifies how digital marketing actions and investments influence customer behavior. *Our team previously built a response attribution product at Experian.* (http://www.experian.com/ assets/marketing-services/product-sheets/dms-response-atribution-solutions- ps.pdf). However, we had to dial back much of the innovation due to needs for backward compatibility.
>
> *We can bring a clearly differentiated and market-leading algorithmic approach.* . . .

(Ex. 36 (emphasis added).)

Plaintiff also alleges that Lehman's sister, Monique Lehman, assisted Thorium with a project based in Europe. In September 2014, she emailed him, asking, "So basically we are making a Polish Experian?" (Ex. 61.) He responded, "Experian for some reason has

somewhat pulled out of EMEA markets for data and analytics.  So the answer is kind of sort of?"  (*Id.*)

<u>Solicitation of Experian Employees</u>

In addition to forming a Thorium "team" comprised of several Experian employees (Thomas, Behrozi, Ghahary, Watkins, etc.), the emails provided by Plaintiff suggest that Lehman reached out to Experian employees to work with/for Thorium.  For instance, on June 30, Lehman sent an email to Behrozi and others indicating that he was considering inviting Govind Asawa to a Thorium meeting to discuss a potential Thorium client.  (Ex. 55.) Behrozi responded that he was "VERY hesitant to involve[] Govind at this point" because he "might put some current Experian employees at risk."  (*Id.*)  Lehman told Behrozi:

> Govind is a practical guy, and he and I remain pretty close. . . . He wants a plan B, and prefers a clean cut to Experian completely.  I asked if he wanted a big data warehousing or Oracle project, which are his main areas.  His response was basically he wants to end the current uncertainty, do something interesting and concrete, and get on any larger/more secure project.

(*Id.*)  After agreeing with Cowie's assertion that Asawa would be a "great addition to Thorium," Thomas suggested to Lehman that "either you/I can talk to him."  (*Id.*)

In September, Lehman forwarded an email from Mark Frisch regarding digital marketing for retail banks.  Lehman asked Thomas to "work with Mark to see if he can create something usable?"  (Ex. 56.)  She promised to talk with him that afternoon.  (*Id.*)

In October, Lehman sent an email to another Experian employee, Gareth Edge, stating:

-10-

> Trevor [Watkins] mentioned we should team up on this. *Thorium will build an attribution offering that fully unleashes the team's creativity.* We won't be held up by direct mail perspectives, backward compatibility of sorts with DMS mainframe, or dinosaur product managers clinging to what they know with fractional attribution. We'll take the math well beyond current offerings starting with the algorithmic approaches the team has already envisioned, and then further to deep learning techniques.

(Ex. 37 (emphasis added).)

Later that month, Behrozi circulated a draft email for a "Thorium Data Science information session and training" scheduled for October 29, 2014, in New York. (Ex. 57.) Plaintiff alleges that several Experian employees attended this meeting, including Watkins, Behrozi, Ghahary, and Mark Wan. (Compl. ¶ 187.)

In December, Ghahary sent a list of Thorium "employees" to Lehman, Thomas, Watkins, and Behrozi. (Ex. 60.) Plaintiff alleges that many of the individuals on the list were still employed by Experian at the time.[2] (Compl. ¶ 192.)

<u>Destruction/Concealment of Information</u>

In November, after Plaintiff requested that Lehman return his hard drive, Watkins sent Lehman an email suggesting that Watkins had prepared a fake Experian hard drive for Lehman to send to his former employer:

> What's your home address, I'll send this to you. It's a laptop hard drive which I've imaged with an [Experian] build and messed with the dates on safe boot to cause it to lock. So if you boot up from it, it's clearly [Experian] but you can't read anything from it . . . Like who logged on when etc.

---

[2]The list includes Asawa, Behrozi, Cowie, Edge, Ghahary, Jackober, Litt, Vladimirov, Wan, Watkins, and others.

(Ex. 49.)  Lehman asked him to "have it expedited ASAP.  Our friend is threatening action now." (*Id.*)  Watkins responded, "I just mailed it the fastest airmail service they do." (*Id.*) Lehman subsequently sent Watkins another email, asking, "Would it be less risky just to use Dban to truly wipe it?  Would not be good to inadvertently drag you into this if they get past safe boot changes and connect the drive to you." (Ex. 50.)  Watkins responded, "Maybe yeah.[] Fdisk should also work since it was encrypted with safe boot.  And just copy some big files onto it." (*Id.*)  On November 27, Lehman told Watkins in a Skype chat that he had received the hard drive and "had it wiped to DoD standard and mailed it on." (Ex. 52.) Watkins responded, "Good to send them a shitty drive back, not the ssd[.]" (*Id.*)

On January 5, 2015, shortly after the termination of a number of Experian employees associated with Thorium, Ghahary sent an email to Behrozi, Thomas, Lehman, and Watkins asking to "lock down all the assets with new passwords and restrictions on the google drive." (Ex. 30.)  He indicated that "[w]e need to scrub every instance of our presentations up there to remove anything close to Experian screens." (*Id.*)  On January 6, 147 ".java" files were allegedly deleted from Lehman's desktop computer and from Thorium's Google drive.

<u>Other information accessed/retained by the Thorium team</u>

When Behrozi returned his laptop computer to Experian following his termination in January 2015, Experian discovered unidentified "proprietary source code" saved in a folder titled "Thorium." (Compl. ¶ 158.)

Before Vladimirov returned his laptop computer to Experian following his termination, he attempted to erase the contents of the hard drive.  Nevertheless, Experian discovered the source code for Conversen on the hard drive.

<u>Data held by Thorium entity in the UK</u>

In July 2014, Watkins emailed Lehman and explained that his accountant suggested creating a new entity in the United Kingdom, which became known as Thorium Data Science Ltd.  (Ex. 64.) On January 29, 2015, after Lehman received the cease-and-desist letter from Plaintiff, the registrar of the thorium3.com domain name was transferred to Thorium Data Science Ltd., with Watkins as the administrator.  (WHOIS Results for thorium3.com, Ex. 66.) On February 11, in response to Plaintiff's request for information, Lehman stated that "[s]ome of the requested items are not accessible to or managed by myself or my company . . .  The cloud storage on Google Drive that Experian has accessed, and the web sites . . . are managed by Trevor Watkins for his UK companies . . . .  I am not part of these companies."  (Ex. 67.)

In March 2015, in response to Plaintiff's request for information, Watkins claimed that he could not provide thorium3.com emails to Plaintiff because doing so would violate data privacy laws.  (Ex. 68.)  At the preliminary injunction hearing, Plaintiff's counsel represented that it had not been able to obtain access to certain information on computers controlled by Watkins or his company, including information and emails stored on servers

associated with thorium3.com. Lehman's counsel represented that he had implored Watkins to provide access, to no avail.

## II.

The issuance of preliminary injunctive relief is committed to the discretion of the district court. *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000). In exercising that discretion, a court must consider whether plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *Id.* These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also Ne. Ohio Coal*, 467 F.3d at 1009. The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1986).

### A. Likelihood of Success

#### 1. Non-Competition

Lehman agreed not to "engage in, solicit or perform any work competitive with any Experian line of business" for which he was employed or possessed confidential information, during his employment and for 12 months thereafter.  (Employment Agreement ¶ 11(c).) Lehman does not dispute that he worked for an Experian division that developed a marketing attribution product.  Lehman asserts that Thorium was "an idea for a potential business" that would not compete with Experian because Thorium would have "an entirely different business model," one "based on services rather than products."  (Lehman Decl. ¶ 6.) However, Plaintiff's evidence suggests that Lehman engaged in discussions with IIS and HP to build a product that would analyze response attribution, the same type of product that Lehman's team had developed at Experian.

Lehman asserts that the non-compete restriction is unenforceable under New York and Illinois law because he was terminated without cause.  *See Francorp, Inc. v. Siebert*, 126 F. Supp. 2d 543, 546-47 (N.D. Ill. 2000) (reasoning that firing without cause "breaches the implied covenant of good faith inherent in every contract"); *SIFCO Indus., Inc. v. Advanced Plating Technologies, Inc.*, 867 F. Supp. 155, 158 (S.D.N.Y. 1994) ("New York courts will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated.").   These cases rest on the principle that an employee's covenant not to compete is founded on a "mutuality of obligation" between the employee and employer, which includes the "employer's continued willingness to employ the party covenanting not to compete." *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

-15-

397 N.E.2d 358, 360 (N.Y. App. Div. 1979). "Where the employer terminates the employment relationship without cause, however, his action necessarily destroys the mutuality of obligation on which the covenant rests[.]" *Id.* at 361. The foregoing principle does not apply to this case, however, because Lehman affirmed his commitment to the non-compete restriction in the Settlement Agreement, in exchange for $250,000 and other compensation. In other words, he agreed to the restriction even though he was being terminated without cause, and he received ample consideration for that agreement. Thus, Lehman's argument is without merit.

Defendants also assert that the breach of contract claims should be dismissed in their entirety because Plaintiff has not alleged any damages. This argument is also meritless because Plaintiff's damages for breach of contract might include the money and other compensation that it paid to Lehman in exchange for his compliance with the obligations of the contract. Thus, at this stage of the proceedings, the Court is satisfied that Plaintiff has demonstrated a strong or substantial likelihood of success on its claim that Lehman breached the covenant not to compete.

### 2. Non-Solicitation of Employees

Lehman also agreed not to "solicit, induce or encourage" Experian employees to accept employment with a "competitor" of Experian. (Employment Agreement ¶ 11(a).) This restriction includes "initiating communications with an Experian employee relating to possible employment." (*Id.*) The evidence before the Court suggests that Lehman

communicated with Experian employees about working for Thorium, and in some cases initiated conversations with those employees about performing work on the development of an "attribution offering" like the one offered by Experian. (*See, e.g.*, Ex. 37 (email to Gareth Edge).) Thus, the Court is satisfied that Plaintiff has demonstrated a substantial likelihood of success on this claim.

### 3. Non-Disclosure and Return of Confidential Information

The Employment Agreement and the Settlement Agreement contain covenants regarding the non-disclosure of Plaintiff's confidential information, and the Settlement Agreement also required Lehman to return all "company property" upon termination, and to not use or retain any materials containing Plaintiff's "confidential and/or proprietary information." (Settlement Agreement ¶¶ 7, 8.) There is no dispute that Lehman retained his company-issued hard drive after he left Experian. Moreover, there does not appear to be any meaningful dispute that he retained, or obtained access to, Experian documents after his employment ended. Some of these documents appear to contain confidential information about Plaintiff's marketing software, including the algorithm used by that software and details about how the software functions. Lehman does not offer any explanation for the emails suggesting that he disclosed these ostensibly confidential documents to IIS and HP. Thus, the Court finds a substantial likelihood of success on Plaintiff's claim that Lehman failed to return and improperly used or disclosed Plaintiff's confidential information.

### 4. Detrimental Action

Plaintiff also seeks to enjoin Lehman from "act[ing] in a manner detrimental to the business and reputation" of Plaintiff (Mot. for Prelim. Inj. ¶ 8, ECF No. 3), which stems from a requirement in the Settlement Agreement that Plaintiff not "act in any manner that might damage the business or reputation of Experian and/or any of its related companies, successors, assigns, officers and directors." (Settlement Agreement ¶ 9.) Plaintiff does not specify what conduct this provision covers that would not be addressed by enforcement of the other provisions of the agreement. Moreover, at this stage of the proceedings, the Court finds that this restriction is too broad to warrant injunctive relief and too vague to be enforceable in an injunction. *See* Fed. R. Civ P. 65(d)(1) (requiring an injunction to "describe in reasonable detail . . . the act or acts restrained or required"). Thus, the Court will not issue an injunction to enforce this provision.

### 5. Tortious Interference with Contract

Plaintiff requests an injunction to stop Defendants from tortiously interfering with its contracts, particularly its employee contracts. The elements of such a claim are: "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 849 (Mich. Ct. App. 2005). Plaintiff contends that Ghahary, Vladimirov, Frisch, and Jakober signed employment agreements in which they agreed to protect and maintain the confidentiality of Plaintiff's trade secrets and confidential

-18-

information, and that Defendants somehow interfered with these contracts. (Compl. ¶¶ 342-44.) It is not clear from Plaintiff's allegations how these employees violated their contractual obligations. Plaintiff apparently contends that Ghahary breached his employment agreement by sending Lehman a Powerpoint presentation containing Experian's confidential information. Nevertheless, it is not clear that Lehman instigated this conduct. Thus, Plaintiff has not established a sufficient likelihood of success to merit injunctive relief on this claim.

6. Misappropriation of Trade Secrets

To establish a cause of action for misappropriation of trade secrets under the MUTSA, Plaintiff must establish "(1) the existence of a trade secret, (2) acquisition of the trade secret in confidence; and (3) unauthorized use or disclosure." *Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 902 (E.D. Mich. 2005). A trade secret is defined as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902(d). Thus, a protectable trade secret must be shown to (1) derive independent economic value from not being generally known, or discoverable through proper means, to others and (2) have been subject to reasonable efforts to maintain its secrecy. *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 410 (6th Cir. 2006).

-19-

Plaintiff seeks a broad injunction to prevent Defendant from using or disclosing any of Plaintiff's confidential information and trade secrets, though the evidence of such information and trade secrets that it has provided pertains to its marketing software. "Under Michigan law, a plaintiff alleging misappropriation of trade secrets is required to identify the trade secrets at issue 'clearly, unambiguously, and with specificity.'" *Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10-CV-450, 2013 WL 603104, at *1 (W.D. Mich. Feb. 19, 2013). This Court has held that it is not necessary make specific allegations *at the pleading stage*. *See id.* Nevertheless, when pursuing a preliminary injunction, Plaintiff must be specific enough to establish a likelihood of success and of irreparable harm.

Defendants have filed a motion to dismiss the MUTSA claim for lack of specificity; in response to the motion, Plaintiff characterizes its trade secrets as "source code, response and marketing attribution platforms, user interface, and algorithms." (*See* Plf.'s Resp. in Opp'n to Mot. to Dismiss 11, ECF No. 23.) Plaintiff's evidence indicates that Lehman (and by extension, Thorium) obtained or had access to the foregoing information, and improperly disclosed some of it to third parties.[3]

Lehman asserts that the type of algorithm used in Plaintiff's marketing software (i.e. fractional attribution) is not a trade secret because it is widely known in the industry. Nevertheless, at this stage of the proceedings, it is reasonable to infer that the manner in

---

[3]Lehman contends that he never accessed the source code, and there is no evidence that he or anyone else disclosed it to third parties.

which the algorithm is used in Plaintiff's software is not widely known and derives independent economic value from not being widely known.

Finally, it is apparent that Plaintiff took steps to ensure that Lehman and other employees would not disclose such information by having them sign confidentiality agreements in connection with their employment. Thus, the Court is satisfied that Plaintiff has demonstrated a likelihood of success on its MUTSA claim, as it pertains to Plaintiff's "source code, response and marketing attribution platforms, user interface, and algorithms." (*Id.*)

### B. Irreparable harm

It is well settled that "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). "[T]he loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.* at 512. In addition, the unauthorized use—actual or threatened—of confidential information constitutes irreparable harm sufficient for issuance of an injunction. *Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 904 (E.D. Mich. 2005). Given Lehman's senior role at Experian, the knowledge that he acquired about Experian's business and the details of its marketing products, as well as the information to which he had access during and after his employment, there is a likelihood of irreparable harm if Lehman is allowed to compete with

Experian, to solicit Experian employees to provide competitive services, or to use or disclose Experian's confidential information and trade secrets.

Defendants argue that irreparable harm has not been shown because Plaintiff cannot point to any activity by Defendants since October 2014 (apart from the deletion of files on Lehman's hard drive in January 2015). Similarly, Lehman's declaration implies that Thorium is not engaged in any ongoing activity that would pose a threat to Plaintiff's business. According to Lehman, Thorium "has no sales except an isolated $41,000 consulting engagement for Adapt.TV, a division of AOL," Thorium "has not won any revenue through the solicitation of potential customers, and . . . [it] has no current customers or clients." (*Id.*) (Lehman Decl. ¶ 9, ECF No. 22-1.) While these facts suggest that Thorium has not been successful in securing significant business, they do not exclude the possibility that Defendants continue to solicit business to provide competing services, or continue to promote and develop a competing product or service using Experian's confidential information.

In addition, the Court is concerned by the apparent disconnect between Lehman's representations and the evidence presently before the Court. For instance, Lehman asserts that he never competed with Experian, he never solicited Experian employees on behalf of Thorium, and he did not take, access, or use Experian's confidential information or alleged trade secrets. (*Id.* ¶ 4.) At the same time, however, Lehman does not disavow the contents of the emails provided by Plaintiff or provide a counter-explanation for them. Thus,

Lehman's declaration leaves the impression that either he construes concepts such as "compete," "solicit," and "confidential information" more narrowly than is warranted, or that he has carefully phrased his declaration to conceal the true nature of his actions. There is also evidence suggesting that Lehman and other individuals working with Thorium intentionally destroyed information in order to conceal their activities. Although Lehman has apparently cooperated with Plaintiff to some degree since that time, Plaintiff asserts (and Defendants do not dispute) that Plaintiff has yet to determine the full extent of Defendants' activities, because Plaintiff still does not have access to information controlled by Watkins from the thorium3.com domain. For all these reasons, the Court does not give much weight to Lehman's assertion that he is not engaged in any ongoing activity that would pose a risk of harm to Plaintiff.

In their response to the motion for a preliminary injunction, Defendants initially argued that Plaintiff's delay in filing the complaint and seeking injunctive relief undermines its claim that it will suffer irreparable harm. Plaintiff obtained evidence as early as January 2015 that, in its view, indicated that Lehman had violated the terms of the Settlement Agreement, but Plaintiff did not file this action until May. At oral argument, however, Defendants' counsel indicated that it did not object to Plaintiff's motion on this basis. Indeed, in its reply, Plaintiff asserts that it obtained access to some of Lehman's devices and data in February and March, but did not complete its investigation of them until mid-April.

Thus, the Court does not consider the delay in seeking injunctive relief to be a barrier to establishing irreparable harm.

In short, the Court finds that Plaintiff has made a sufficient showing of irreparable harm to warrant an injunction to prevent the misappropriation of trade secrets and to enforce the restrictive covenants in the Settlement Agreement regarding competition, the solicitation of Experian employees, the use/disclosure of Experian's confidential information and trade secrets, and the return of such information in Defendants' control.  However, the injunction will be limited to the type of conduct for which there is the strongest evidence of a likelihood of harm, i.e., the development and promotion of products or services competitive with Experian's products and services for analysis of marketing data, the solicitation of Experian employees for that purpose, and the use of Experian's confidential information and trade secrets related to those products and services.

### C. Harm to Defendant/Others

Counsel for Defendants conceded at oral argument that any harm to them from the issuance of an injunction would be minimal, because they claim that they are not presently engaged in any activity that would be covered by the requested injunction.  On the other hand, counsel argued that the existence of an injunction would harm Lehman's reputation and cast a shadow over future business prospects.  According to Lehman, he has already lost several "business opportunities" as a result of this pending litigation, and an "entire team of consultants intending to join Thorium to form a cyber-security business has declined to move forward[.]"  (Lehman Decl. ¶ 18.)  When Lehman signed the Settlement Agreement,

however, he expressly agreed to the restrictions that Plaintiff now seeks to enforce. Moreover, when he signed the Employment Agreement, he agreed that a violation of the restrictive covenants would cause irreparable harm and that Plaintiff would be entitled to injunctive relief to enforce them. (Employment Agreement ¶ 12.)  Thus, he assumed the risk that a possible breach of the agreement would result in the negative effects he describes. Consequently, the potential harm to Defendants does not significantly weigh against an injunction.

### D.  Public interest

It is well established that the public has a substantial interest in the enforcement of contractual obligations.   Thus, the last factor weighs in favor of preliminary relief.

### III.

In light of the foregoing, Plaintiff's motion for a preliminary injunction will be granted in part and denied in part.  The balance of factors favor an injunction to prevent the misappropriation of trade secrets and to enforce the restrictive covenants in the Settlement Agreement regarding competition, solicitation of employees, use/disclosure of Experian's confidential information and trade secrets, and the return of such information in Defendants' possession or control.  The Court will not issue an injunction to prevent the alleged tortious interference with Plaintiff's employee contracts or to enforce the contractual requirement not to engage in "detrimental" action toward Plaintiff.

An order will be entered that is consistent with this opinion.


Dated: <u>June 18, 2015</u>                              <u>/s/ Robert Holmes Bell</u>
                                                 ROBERT HOLMES BELL
                                                 UNITED STATES DISTRICT JUDGE