## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| **EXPERIAN  MARKETING SOLUTIONS,** **INC**., a Delaware Corporation, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:15-CV-00476-RHB |
| v. | ) ) | |
| **JEREMY LEHMAN**, an individual; **THORIUM DATA SCIENCE, LLC**, a Michigan limited liability company, | ) ) ) ) | Hon. Robert Holmes Bell |
| Defendants. | ) | |

### FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Experian Marketing Solutions, Inc. ("Experian" or "EMS") as its First Amended Complaint for Injunctive and Other Relief against Defendants Jeremy Lehman ("Lehman") and Thorium Data Science, LLC ("Thorium") (Lehman and Thorium are sometimes collectively referred to as "Defendants") states as follows:

### NATURE OF THE ACTION

1.      This is an action for violation of the Computer Fraud and Abuse Act, the Michigan Uniform Trade Secrets Act, breach of contract, breach of fiduciary duty, and tortious interference with contract. EMS seeks preliminary and permanent injunctive relief, in addition to damages.

2.      Plaintiff is a global leader in marketing services. The marketing services industry is highly competitive and specialized, and provision of these services by EMS involves the application and use of EMS proprietary technology, processes and information.

3.      EMS hired Lehman effective July 12, 2011 as its Executive Vice President for Global Product Development and Delivery. In this position Lehman, among other things,

reported to the President of Global Marketing Services, led global teams comprised of hundreds of employees and had access to EMS' highly confidential and proprietary information, including but not limited to global business plans and strategies, proprietary technologies and source codes.

4.      On March 12, 2014, Lehman was officially notified that his position at EMS would be eliminated effective June 30, 2014, but that he could remain an employee of EMS through June 30, 2014 (the period from March 12, 2014 through June 30, 2014 is called the "Notice Period").

5.      During the Notice Period, Lehman took steps to form two companies to compete with EMS.  One company was in the United States – Thorium, and the other company was in the United Kingdom.  In addition, Lehman began to recruit EMS employees to work for his new companies to compete against EMS, while the employees were still employed by EMS.

6.      During the Notice Period Lehman had the domain name thorium3.com registered and provided himself and the EMS employees that he was recruiting with thorium3.com email addresses so that they could communicate with one another.

7.      During the Notice Period, Lehman and the EMS employees that he recruited, misappropriated EMS' proprietary and confidential information, including critical EMS source codes and analytics; used EMS Proprietary confidential information and trade secrets to promote and solicit clients for Thorium; solicited additional EMS employees to work for Thorium while they were working for and being paid by EMS; charged EMS for expenses related to out-of-town meetings and conference attendance, which benefited Thorium and not EMS and misrepresented those expenses to obtain reimbursement from EMS; and used EMS resources, time, property, and network services for the benefit of Thorium.

8.      During the Notice Period, Lehman also solicited an EMS vendor to assist him in the creation of Thorium.

9.      Both prior to and during the Notice Period, Lehman, in breach of EMS security policies, provided at least one employee of that vendor with an EMS keycard and open access to EMS' New York office.

10.     After Lehman's employment ended, EMS requested that Lehman return all EMS property in his possession, including the EMS computer that had been provided to him as an employee of EMS.

11.     After repeated demands, Lehman returned the EMS computer in October of 2014, after removing the hard drive.

12.     Thereafter, EMS made repeated requests that Lehman return the computer hard drive that he had removed.  Lehman waited an approximately two more months, deleted the data on the hard drive and returned the hard drive with all of the data deleted.

13.     Thorium, through Lehman and other now-former EMS employees, is currently using EMS' proprietary and confidential information to directly and unfairly compete with EMS and to damage EMS' good will and reputation in the industry.

14.     By his actions set forth above, Lehman violated his fiduciary duty to EMS and numerous contractual promises he made to EMS including, inter alia, his Employee Agreement Regarding Confidential Information, Intellectual Property, Non-Competition and Non-Solicitation and his Settlement Agreement.

15.     Lehman and Thorium have tortiously interfered and continue to tortiously interfere with EMS' agreements with now former EMS employees that work for Thorium.

16.     Thorium and Lehman knew that the EMS employees who were solicited by Lehman and/or performed services for Thorium while still employed by EMS had each executed EMS' Employee Agreement Regarding Confidential Information, Intellectual Property, Non-Competition and Non-Solicitation.  Despite this knowledge Lehman and Thorium induced those employees to violate their agreements by accessing EMS proprietary confidential information and trade secrets for the benefit of Thorium, by performing services for Thorium while still employed by EMS and by working for Thorium following their EMS employment.

17.     Additionally, Lehman and Thorium misappropriated EMS' trade secret and confidential information, including, but not limited to, proprietary technology, business plans and strategies, customer plans and strategies, among other things.

18.     Finally, Lehman accessed EMS data without authorization following termination of his employment and transmitted EMS proprietary and confidential data to Thorium and then implemented a data destruction program which removed, altered, destroyed and/or deleted protected data from his EMS laptop hard drive without authorization in violation of the Computer Fraud and Abuse Act ("CFAA"), Title 18 U.S.C. § 1030 et seq.

19.     In addition to damages, EMS seeks to preliminarily and permanently enjoin Lehman and Thorium from using or threatening to use EMS' proprietary and confidential information and trade secrets and tortiously interfering with EMS' contracts with its employees and its former employees. In addition, EMS seeks to preliminarily and permanently enjoin Lehman from his ongoing breaches of his contractual obligations to EMS.

20.     Absent such injunctive relief, EMS faces irreparable injury, including the loss of invaluable proprietary confidential information and trade secrets, loss of customers, loss of good

will and damage to its reputation in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of this Court.

## PARTIES

21.    Plaintiff, Experian Marketing Solutions, Inc., is a Delaware corporation with its principal place of business at 955 American Lane, Schaumburg, Illinois 60173. EMS is a leading data management, processing, analytics, and delivery company for marketers in a variety of industries in the United States. EMS is not a citizen of the State of Michigan within the meaning of 28 U.S.C. § 1332(c)(1).

22.    Defendant, Jeremy Lehman, is an individual who was employed by Plaintiff from July 12, 2011 until June 30, 2014. Lehman is currently the Managing Partner and Co-Founder of Thorium. Lehman is permanently domiciled at 2121 Robinson Street SE, Grand Rapids, Michigan 49506. Lehman is a citizen of the State of Michigan within the meaning of 28 U.S.C. § 1332(c)(1).

23.    Defendant, Thorium Data Sciences, LLC, is a limited liability company organized and existing under the laws of the State of Michigan, with its principal place of business located at 2121 Robinson Street SE, Grand Rapids, Michigan 49506. Thorium is a data sciences consulting firm. On information and belief, Lehman is the sole member of Thorium and Thorium does not have any members who are citizens of Delaware or Illinois within the meaning of 28 U.S.C. § 1332(c)(1).

## JURISDICTION AND VENUE

24.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based upon a claim arising under the Computer Fraud and Abuse Act, Title 18 U.S.C. § 1030, and supplemental jurisdiction pursuant to 28 U.S.C. 1367.

25.     This Court also has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states (EMS is a Delaware corporation with its principal place of business in Schaumburg, Illinois; Thorium is a Michigan limited liability company with no members who are citizens of either Delaware or Illinois; Lehman is a Michigan citizen) and the matter in controversy exceeds $75,000.00 excluding interests and costs.

26.     This Court has personal jurisdiction over Defendants, and venue is proper in this District under 28 U.S.C. § 1391 because (a) Thorium is a Michigan limited liability company with its principal place of business in Grand Rapids, Michigan; (b) Lehman resides in Grand Rapids, Michigan; and (c) a substantial part of the events or omissions giving rise to the claims at issue occurred in this judicial district.

## THE COMPETITIVE MARKET FOR EMS' SERVICES

27.     EMS provides marketing services to a variety of clients focused on helping clients communicate effectively with their customers through multiple channels and measuring the effectiveness of those communications. EMS' information, proprietary processes and data analytics, data management, insight, and delivery solutions power smarter cross-channel direct-marketing strategies and deliver true customer connections for marketers in the catalog, retail, financial services, nonprofit, media, consumer products, mid-tier/reseller, and other sectors.

28.     The field of marketing services is highly competitive. The provision of these services involves the use of proprietary techniques to maximize the effectiveness of a client's cross-channel direct marketing activities. EMS has spent years and considerable sums developing its confidential and proprietary information used for providing marketing and data analytic services.

29.     EMS has invested substantial time and money in the protection of its proprietary processes and technology that has not been disclosed to or is not known by the general public or EMS' competitors.

**LEHMAN'S EMPLOYMENT AT EMS**

30.     EMS hired Lehman on or about July 11, 2011 as an Executive Vice President for Global Product Development and Delivery, a position that he held throughout his employed with EMS.  Lehman reported to Mike DeVico, President of Global Marketing Services.

31.     As an employee of EMS, Lehman's primary responsibilities included delivery of products and client services to EMS' clients/customers, identifying and procuring business from prospective clients/customers, marketing services, and providing leadership within the global product development and delivery group within EMS.

32.     Lehman was also responsible for managing and supervising the Global Operations Division, the Platforms Division, the Data, Data Quality & Data Management Division, the Data Science Division, the Strategic Programs Division, the Accelerated Strategy and Products Division, and the Finance and Human Resources Divisions.

33.     Lehman was also responsible for overseeing teams of hundreds of employees in the United States, the United Kingdom, France, Germany, Costa Rica, Australia, and Malaysia.

34.     From July 2011 through June 2014, Lehman was materially and actively involved in a number of technological and strategic initiatives for EMS.

35.     For example, Lehman created and implemented the Data Science Division within Global Product Development and Design. Lehman hired Trevor Watkins ("Watkins") to lead the Data Science Division, and Lehman and Watkins began the development of data science services for EMS clients.

36.     One data science service developed by Lehman and Watkins for EMS clients was a cross channel marketing platform that measured marketing attribution. The marketing or response attribution program informs EMS clients of how successful their email and digital marketing efforts are in driving customers to visit their websites and/or physical stores.

37.     Lehman also played a significant role in EMS' May 2012 acquisition of Conversen, a cross channel marketing platform. Conversen was co-founded by Sergey Vladimirov. After the acquisition by EMS, Lehman hired Sergey Vladimirov to work for EMS as a Data Architect and Development Manager in Global Product Development and Design.

38.     EMS purchased Conversen's source code as part of the acquisition of Conversen.

## LEHMAN'S CONTRACTS WITH EMS

39.     On or about July 11, 2011, as a condition of employment with EMS, Lehman entered into an Employee Agreement Regarding Confidential Information, Intellectual Property, Non-Competition and Non-Solicitation ("Employment Agreement"), a copy of which is attached as Exhibit 1.

40.     Section 6 of the Employment Agreement provides:

> During and after my employment with Experian, I will not (a) disclose, directly or indirectly, any Confidential Information to anyone outside of Experian or to any employees of Experian not authorized to receive such information; (b) use any Confidential Information other than as may be necessary to perform my duties at Experian; or (c) take any action that may result in the prohibited use or disclosure of Confidential Information. In no event will I disclose any Confidential Information to, or use any Confidential Information for the benefit of, any current or future competitor, supplier or client of Experian, whether on behalf of myself, any subsequent employer, or any other person or entity.

41.     Section 10 of the Employment Agreement provides:

> Upon termination of my employment with Experian or upon Experian's request, I will deliver to Experian all of Experian's property in my possession, including notebooks, reports, manuals, programming data,

listings and materials, engineering or patent drawings, patent applications, any other documents, files or materials which contain, mention or relate to Confidential Information, and all copies and summaries of such material whether in human- or machine-readable-only form, that I may have or that may come into my custody while employed by Experian.

42.    Section 11 of the Employment Agreement provides:

*Restrictive Covenants*. In order to protect the legitimate and protectable business interests of Experian, I agree to the following restrictive covenants:

(a) <u>Non-Solicitation of Employees</u>. While employed by Experian and for a period of twelve (12) months following termination of my employment with Experian for any reason, including terminating by Experian with or without cause, I agree that I will not directly or indirectly solicit, induce or encourage any Experian employee(s) to terminate their employment with Experian or to accept employment with any competitor, supplier or client of Experian, nor shall I cooperate with any others in doing or attempting to do so. As used herein, the term "solicit, induce or encourage" includes, but is not limited to, (i) initiating communications with an Experian employee relating to possible employment, (ii) offering bonuses or additional compensation to encourage Experian's employees to terminate their employment with Experian and accept employment with a competitor, supplier or client of Experian, or (iii) referring Experian's employees to personnel or agents employed by competitors, suppliers or clients of Experian.

(b) <u>Non-Solicitation of Clients</u>. For a period of twelve (12) months from the date of termination of my employment with Experian for any reason, including termination by Experian with or without cause, I agree that I will not, either directly or indirectly, as a principal, agent, contractor, employee, employer, partner or shareholder (other than as an owner of 2% or less of the stock of a public corporation) or in any other capacity, solicit or engage in the business engaged in by Experian as of the date of termination of my employment ("Experian Business") with any client which was a client, or a prospective client, of Experian (provided I had responsibilities or duties with respect to, possess Confidential Information regarding, or was involved in the development of, such client or prospective client), within the twelve (12) months immediately preceding my termination.

(c) <u>Non-Competition</u>. While employed by Experian and for a period of twelve (12) months following termination of my employment for any reason, except termination by Experian without cause, I agree that I will not directly or indirectly, as a principal, agent, contractor, employee,

9

employer, partner, shareholder (other than as an owner of 2% or less of the stock of a public corporation) or in any other capacity engage in, solicit or perform any work competitive with any Experian line of business for which I have performed work within the last 12 months or for which I possess or have access to confidential Information.

43.     Section 22 of the Employee Agreement provides: "*Recovery of Expenses*. I agree to pay to Experian the costs and reasonable attorney's fees incurred by Experian if it prevails in enforcing any or all of the terms of this Agreement."

44.     Also as a condition of employment, Lehman agreed to comply with the Experian Global Code of Conduct, a copy of which is attached as <u>Exhibit 2</u>.

45.     Section 4 of the Global Code of Conduct provides:

> Outside employment can, by its nature, lessen the impartiality, judgment, effectiveness or productivity expected from you in your job. Therefore, Experian requires all employees to disclose any potential outside employment conflict to their supervisor and obtain written approval from Experian management prior to engaging in any such activity.

46.     Section 6 of the Global Code of Conduct provides "Employees have a responsibility to use Experian property and assets for Company business, and not to allow them to be used for any type of personal gain."

47.     Section 7 of the Global Code of Conduct provides:

> Confidential information is information which derives independent economic value from not being generally known by the public. Confidential information includes Experian developed confidential information as well as confidential information provided to Experian by clients, consumers, suppliers and other third parties. It is the responsibility of every Experian employee to protect and maintain all confidential information in accordance with applicable legal and contractual restrictions as well as relevant Experian policies.

48.     Section 8 of the Global Code of Conduct provides:

> Supervisors must not only comply with the Code, but are expected to set an example for those reporting to them. Supervisors have a responsibility to monitor the conduct of people they supervise and promote compliance

with applicable laws, regulations and this Code. Supervisors have a
responsibility to support employees who seek guidance or report
misconduct or concerns.

49.     Also as a condition of employment, Lehman agreed to comply with the Experian

Information Security User Acknowledgment and Agreement ("Information Security

Agreement"), a copy of which is attached as Exhibit 3.  As part of the Information Security

Agreement, Lehman agreed to:

> Upon authorization, use information, information systems, and software in
> accordance with Experian policies. The use of all Experian computers,
> software, and devices shall be restricted to the conducting of Experian
> business.
>
> Access information within the access parameters provided. Unauthorized
> attempts to gain privileged access beyond your job role or access to any
> account not belonging to you on any Experian system is expressly
> prohibited.
>
> Immediately surrender to Experian all devices, materials and information
> provided by or related to Experian, upon such time you are no longer
> employed or providing series to Experian.

## LEHMAN'S TERMINATION AND SEVERANCE

50.     On March 12, 2014, EMS provided Lehman with notice of position elimination

and termination of employment effective July 1, 2014.

51.     In connection with his termination, Lehman was provided a severance package,

which included a Settlement Agreement and General Release ("Settlement Agreement") that he

was given 45 days to execute, a copy of which is attached as Exhibit 4. The severance package

included an offer to pay Lehman a lump sum of $250,000, as well as a prorated payout of

Lehman's 2011, 2012, and 2013 stock option grants ("Severance Payment") in consideration for

execution of the Settlement Agreement.

11

52.    Lehman executed the Settlement Agreement on April 25, 2014 and was paid the Severance Payment on June 30, 2014.

53.    Section 3 of the Settlement Agreement provides:

> Restrictive Covenants: Lehman acknowledges and fully understands that he is obligated to comply with the terms of the restrictive covenants in the Employee Agreement Regarding Confidential Information, Intellectual Property, Non-Competition and Non-Solicitation, which he signed on July 11, 2011 at the commencement of his employment with Experian. A copy of the Employee Agreement is attached hereto and is incorporated into this Separation Agreement and General Release as if specifically set forth herein.

54.    Section 7 of the Settlement Agreement provides:

> Treatment of Confidential and/or Proprietary Information:    Lehman acknowledges that as an employee of Experian he possessed and has had access to extensive confidential and/or proprietary information. Such information includes all trade secret information as well as all information of a sensitive nature. Lehman agrees not to use or give to any other person any such confidential and/or proprietary information without the prior express written approval of an officer of Experian. Lehman represents that he has not taken with him, and will not take with him, any materials that contain any Experian confidential and/or proprietary information. If Lehman is in doubt as to the confidential and/or proprietary nature of any information, he agrees that he will submit such information to Experian for a determination of such status before it is disclosed to any other person.

55.    Section 8 of the Settlement Agreement provides:

> Return of Documents and Property: Lehman represents that upon termination of his employment, he will deliver all company property to Experian including but not limited to all documents, records, files, computer equipment and programs, data and the like, relating to Experian's business together with any other of Experian's property, which Lehman had in his custody and possession.

56.    Section 10 of the Settlement Agreement provides:

> Conduct: Lehman agrees he will not act in any manner that might damage the business or reputation of Experian and/or any of its related companies, successors, assigns, officers and directors. Lehman agrees that he will not counsel or assist any attorneys or their clients in the presentation or

12

prosecution of any disputes, differences, grievances, claims, charges or complaints by any third party against Experian and/or any officer, director, employee, agent, representative, shareholder or attorney of Experian, unless under a subpoena or court order to do so. Lehman agrees that he will cooperate and assist Experian or its attorneys in the prosecution or defense of any actions or claims against Experian by any third party.

57.    Section 16 of the Settlement Agreement provides: "The parties further agree that in the event that suit is instituted to enforce any of the rights of the parties to this Agreement, the prevailing party in such litigation shall be entitled, as additional damages, to reasonably incurred attorneys' fees and costs incurred in the enforcement of this Agreement."

58.    Lehman's last day as an EMS employee was June 30, 2014.

59.    After the termination of Lehman's employment, EMS repeatedly requested that Lehman return his EMS laptop computer, which Lehman refused to do.

60.    In October 2014, EMS received a whistleblower complaint complaining about misconduct by Lehman.  As result, EMS commenced an investigation of Lehman.

61.    After repeated requests, Lehman, after removing its hard drive, returned the EMS computer on October 31, 2014.

62.    After EMS discovered the Lehman had removed the computer hard drive, EMS began requesting that Lehman provide it with the computer hard drive.

63.    Throughout the month of November 2014, Lehman repeatedly informed EMS that he would give them the hard drive, but he did not do so.

64.    Instead, Lehman ran a computer program on the hard drive to delete all information and EMS data on the hard drive.

65.    Finally, on December 2, 2014, Lehman provided the deleted hard drive to EMS.

66.    As a result of EMS' investigation, EMS learned that Lehman: breached his fiduciary duties to EMS during the Notice Period; breached the competitive activity, confidential

13

information, employee solicitation, and customer solicitation provisions of his Employee Agreement during and following the Notice Period; and breached the terms of the Settlement Agreement both during and following the Notice Period.

67.     Upon learning of Lehman's breaches of fiduciary duty, unlawful destruction of EMS data, and his numerous breaches of the Employee Agreement and Settlement Agreement, on or about January 22, 2015, EMS notified Lehman and Thorium of its concerns related to Defendants' improper taking and use of EMS' confidential and proprietary information and breach of the Confidentiality Agreement and Settlement Agreement. EMS demanded that Defendants Lehman and Thorium cease and desist such wrongful activities, and informed Lehman that EMS was converting his termination to one for misconduct and demanded the return of the Severance Payment and benefits provided as part of his termination package. (See January 22, 2015 letter to Lehman, a copy of which is attached as Exhibit 5).

68.     During February and March, 2015, Lehman purported to cooperate with EMS and provided EMS with access to some of his devices and data in an attempt to clear himself and Thorium of any wrongdoing.

69.     EMS engaged Navigant Consulting to assist with the forensic collection and analysis of data collected from devices provided by Lehman as well as devices in the possession of EMS.

70.     Review of information and materials identified in the forensic review by Navigant revealed substantial additional wrongdoing by Lehman both during and after the Notice Period, which has damaged and continues to damage EMS.

## LEHMAN'S DIRECT REPORTS

71.     Lehman supervised Trevor Watkins ("Watkins"), who was employed by EMS until January 2015.

72.     Lehman supervised Anna Thomas ("Thomas"), who was employed by EMS until approximately July 2015.

73.     Lehman supervised Gordon Cowie ("Cowie"), who was employed by EMS until January 2015.

74.     Lehman supervised Amir Behrozi ("Behrozi"), who was employed by EMS until January 2015.

75.     Lehman supervised Salar Ghahary ("Ghahary"), who was employed by EMS from approximately April 2012 until January 2015.

76.     Ghahary executed an employment contract with EMS. A copy of this contract is attached as Exhibit 6.

77.     Lehman supervised Mark Frisch ("Frisch"), who was employed by EMS or related entities from approximately March 1997 until January 2015.

78.     Frisch executed an employment contract with a predecessor to EMS. A copy of this contract is attached as Exhibit 7.

79.     Lehman supervised Sergey Vladimirov ("Vladimirov"), who was employed by EMS from approximately May 2012 until January 2015.

80.     Vladimirov, via Conversen, executed an employment agreement with EMS. A copy of this contract is attached as Exhibit 8.

81.     Lehman supervised Sarah Litt ("Litt"), who was employed by EMS until January 2015.

82.     Lehman supervised Monika Jakober ("Jakober") who was employed by EMS from approximately June 2012 through January 2015.

83.     Jakober executed an employment contract with EMS. A copy of this contract is attached as Exhibit 9.

## LEHMAN'S ACCESS TO PROPRIETARY AND CONFIDENTIAL INFORMATION AND TRADE SECRETS

84.     Because of Lehman's senior executive position as Executive Vice President, Lehman was provided with and had access to EMS' highest level of proprietary and confidential information and trade secrets.

85.     Lehman developed a working knowledge of and was privy to EMS' confidential and proprietary information and/or trade secrets, including but not limited to, EMS' source codes; EMS' financial information; EMS' sales information; EMS' marketing research, plans and strategies; EMS' analysis of competitive advantages and strategies regarding particular market forces and other companies; EMS' methods and methodologies; EMS' systems; EMS' designs; EMS' processes; EMS' operations; and EMS' computer software and database solutions, programs, products, services, specifically including EMS' confidential and proprietary source codes, analytics and technology.

86.     Lehman was advised and knew that this information was confidential, proprietary and not intended for dissemination and expressly agreed to safeguard and protect such information.

87.     The confidential and proprietary information and trade secrets with which Lehman was provided are not generally available to persons outside of EMS, and are only known by EMS employees who have a "need to know" the information as part of their job duties.

88.     EMS' Information Security Agreement expressly prohibits "[u]nauthorized attempts to gain privileged access beyond [the employee's] job role or access to any account not belonging to [the employee] on any Experian system[.]" (Exhibit 3, at p. 1).

89.     Similarly, EMS' Global Code of Conduct requires every EMS employee to protect and maintain confidential information, or "information which derives independent economic value from not being generally known by the public." (Exhibit 2, at Section 6).

90.     In addition to requiring employees to agree to protect and maintain as confidential all EMS proprietary and confidential information and trade secrets, EMS takes additional steps including but not limited to the use of password protected servers; restrictions on computer and server access; restrictions on copying and distribution of materials; and marking such information as confidential.

91.     Lehman was advised and knew that this information was confidential, proprietary, and not intended for dissemination and expressly agreed to safeguard and protect the confidentiality of such information by signing and agreeing to be bound by the terms of EMS Confidentiality Policies.

92.     Lehman is using EMS' confidential and proprietary information in his work for Thorium, in developing products that are directly competitive to and based upon products he helped develop while employed by EMS.

93.     Likewise, Thorium is inevitably using EMS' confidential and proprietary information because its existence is built upon EMS' confidential information and trade secrets. EMS is suffering and will continue to suffer damages if it's confidential and proprietary and/or trade secret information continues to be disclosed and/or used for the benefit of EMS.

## LEHMAN VIOLATED HIS OBLIGATIONS TO EMS
## <u>DURING THE NOTICE PERIOD</u>

94.     On March 18, 2014, at the commencement of the Notice Period and while employed by EMS, Lehman drafted a document which outlined his plan for developing a competing business, initially named Integrity Analytics ("Business Plan"). (See March 18, 2014 word document, a copy of which is attached as <u>Exhibit 10</u>).

95.     According to Lehman's Business Plan, <u>Exhibit 10,</u> Lehman created Integrity Analytics to offer professional services in predictive modeling and data analytics, among other things, and planned that it would partner with an analytics platform called Hewlett Packard Vertica ("HP Vertica").

96.     The entity described as Integrity Analytics in <u>Exhibit 10</u> eventually became known as Thorium, a data analytic marketing services company.

97.     While employed by EMS, Lehman recruited EMS employees to begin working for him in order to carry out his Business Plan to move forward with his new enterprise.

98.     On or about March 27, 2014, Lehman drafted another document, a copy of which is attached as <u>Exhibit 11</u>. <u>Exhibit 11</u> describes the then EMS employees that were part of Lehman's Integrity Analytics "team" as including "Trevor [Watkins] & team, Amir [Behrozi], Anna [Thomas], Govind [Asawa], Mark F[risch], Gordie [Gordon Cowie] & team, Sergey [Vladimirov]" and others.

99.     On or about April 15, 2014, Lehman drafted a third document, titled "Forward", a copy of which is attached as <u>Exhibit 12</u>. This document lists the next steps Lehman planned to take to move forward with his new enterprise.

100.    Lehman scheduled a team meeting for April 22, 2014 of the EMS employees that he had recruited to help him with his new enterprise.

101.    In Exhibit 12, in preparation for an April 22, 2014 "team meeting" for his new enterprise, Lehman listed EMS employee and Salar Ghahary ("Ghahary") as a participant, and wrote "plan on Gordie [Cowie]."

102.    Part of Lehman's business plan included working with one of EMS' vendors, IIS, and one of its employees, Harvey Pass, to develop HP Vertica as the analytic database platform for his new business.

103.    On May 12, 2014, Lehman emailed EMS employees Watkins, Anna Thomas, and Amir Behrozi with regard to an upcoming meeting at IIS's offices with Bloomberg to discuss Lehman's new venture. Lehman wrote "Trevor and Amir, can you dial in? Anna, can you join in person? Anna, I haven't spoken to Gordie recently. Harvey [Pass of IIS] recommends we show lots of technical depth at this conversation. Should we see if Gordie can join?" (See May 12, 2014 Email, a copy of which is attached as Exhibit 13).

104.    At the time Lehman sent this email asking for participation in the upcoming meeting, Watkins, Thomas, Behrozi, and Cowie were all current EMS employees.

105.    Throughout the Notice Period, and during EMS work hours, Lehman worked with EMS employees to develop and strategize the launch of Thorium, including creation of a website, strategic plan, marketing materials, and preparing and testing for Thorium employees' HP Vertica certifications utilizing EMS resources, including EMS computers, network services, and phone services.

106.    On May 21, 2014, Ghahary registered the domain name "thorium3.com" with web.com. (See May 21, 2014 Registration with web.com, a copy of which is attached as Exhibit 14).

19

107.    Thereafter, Lehman assigned himself and other EMS employees with whom he was working with thorium3.com email addresses.

108.    As early as May 2014 Lehman, Watkins and the other EMS employees working with Lehman on his competitive enterprise communicated with each other using their assigned thorium3.com email addresses.

109.    On June 25, 2014, Lehman filed the Articles of Organization for Thorium Data Science LLC with the Michigan Department of Licensing and Regulatory Affairs, a copy of which is attached as Exhibit 15.

**Lehman and Other EMS Employees use EMS resources to Attend the June, 2014 HP Vertica Conference for the Benefit of Thorium**

110.    Thorium planned to use the HP Vertica platform as the analytic database platform for its business, which is a platform that is not used by EMS.

111.    Throughout the Spring of 2014, Lehman and other EMS employees that Lehman had solicited to work for Thorium planned to attend the HP Discover Conference held in Las Vegas, Nevada June 10 through 12, 2014.

112.    The HP Discover Conference is HP's showcase technology event. In 2014, the HP Discover Conference focused in part on showcasing HP Vertica.

113.    Throughout March, April, May and June 2014, Lehman and EMS employees that Lehman had solicited to work for Thorium coordinated their plans to travel to Las Vegas for the HP Discover Conference with the intention of attending the Conference to promote and market Thorium. (See May 28, 2014 Email, a copy of which is attached as Exhibit 16 and May 24, 2014 Email, a copy of which is attached as Exhibit 17).

114.    Because EMS did not use the HP Vertica platform, EMS instructed its employees not to attend the HP Discover Conference. For example, on May 22, 2014, Michael DeVico,

Lehman's superior, instructed Lehman by email to cancel several of his upcoming travel plans, including his trip to Las Vegas for the HP Discover Conference. (See May 22, 2014 Email, a copy of which is attached as Exhibit 18).

115.    Similarly, on May 27, 2014, Emad Georgy, a Senior Vice President of Global Software Development at EMS, instructed Sergey Vladimirov ("Vladimirov") not to attend the HP Discover Conference.

116.    Because EMS instructed Lehman not to attend the HP Discovery Conference, Lehman emailed Harvey Pass of IIS to request help in registering for the HP Discovery Conference.

117.    On May 28, 2014, at Lehman's direction Thomas was attempting to acquire a pass to the Conference and communicated to Lehman "I dont [sic] want to charge on EMS. I know since they are already on this case about not having a business case for Vertica, dont [sic] want to draw attention." (See May 28, 2014 Email, a copy of which is attached as Exhibit 19). Lehman had suggested to Thomas that "[o]ne option may simply be to sign up via EMS and ask for forgiveness later."

118.    While employed by EMS, Lehman, Behrozi, Watkins, Thomas, Cowie, Mark Wan ("Wan") and other EMS employees attended the HP Discover conference in Las Vegas on or about June 10-12, 2014.

119.    These EMS employees attended the HP Discover Conference to discuss and promote Thorium and not EMS. While attending the HP Discover Conference, these EMS employees received training on the HP Vertica platform for the benefit of Thorium, rather than EMS.

120.     In July, after attending the conference, Manoj Khanwalkar, Behrozi's superior, emailed Behrozi and asked what EMS business was performed at HP Discover as he had not been given permission to attend the conference. (See July 12, 2014 Email, a copy of which is attached as Exhibit 20).

121.     While Lehman did not submit expense reports to EMS to cover the costs of his trip to Las Vegas for the HP Discover Conference, Watkins, Thomas, and Behrozi, who attended the HP Vertica conference on behalf of Thorium, sought reimbursement from EMS for their travel and lodging expenses related to the HP Discover Conference. (See Expense Reports, copies of which are attached as Exhibits 21, 22, and 23).

**Lehman Holds Thorium Meeting in New York on June 25, 2014
Using EMS Resources**

122.     Following the HP Discover Conference in Las Vegas, Lehman prepared a document titled "Actions from HP Discover" that summarized activities engaged in by EMS employees at the HP Discover Conference for the benefit of Thorium and detailed next steps and projects for various Thorium team members. (See Document titled "Actions from HP Discover," a copy of which is attached as Exhibit 24).

123.     The "Actions from HP Discover" document also stated that each Thorium team member was expected to acquire HP Vertica certification, which would entail preparing for and taking a certification examination administered by HP Vertica. (See Exhibit 24).

124.     On June 24, 2014, Thomas sent an email to Behrozi, Ghahary, Lehman, Cowie, and Watkins regarding a Thorium meeting scheduled to take place on June 25, 2014 at IIS's office in New York, New York. Thomas attached the document, "Actions from HP Discover", to this email.  (See June 24, 2014 Email, a copy of which is attached as Exhibit 25).

125.    On Wednesday, June 25, 2014, EMS employees Lehman, Watkins, Thomas, Behrozi, Ghahary, and other EMS employees attended the Thorium meeting in New York during EMS work hours.

126.    At least Behrozi and Watkins sought reimbursement from EMS for their travel and lodging expenses related to the Thorium meeting. (See Expense Reports, copies of which are attached as Exhibits 21 and 23).

127.    On June 27, 2014, following the Thorium meeting in New York, as opposed to having to take and pass the certification test, Cowie circulated the HP Vertica certification question and answers to Watkins, Behrozi, Lehman, Thomas, and Vladimirov. (See June 27, 2014 Email, a copy of which is attached as Exhibit 26).

128.    Thomas was terminated from Experian in July 2014 due to the elimination of her position.

### DEFENDANT LEHMAN VIOLATED HIS OBLIGATIONS TO EMS AFTER THE NOTICE PERIOD

#### Lehman Continued to Access and Use EMS' Confidential Information To Build And Promote Thorium Following his Last Day of Employment on June 30, 2014

129.    Lehman's last day of employment was June 30, 2014.

130.    On July 15, 2014, Lehman emailed Behrozi, who was still employed by EMS, and asked him to access EMS' proprietary and protected network and send to Lehman reports for which EMS purchased subscriptions, because he was "[l]ooking for this both for citations for a business plan, and also to study." (See July 15, 2014 Email, a copy of which is attached as Exhibit 27).

131.    On July 18, 2014, in preparation for a Thorium meeting with Quest International, a potential Thorium client, Watkins emailed Lehman, Cowie, and Behrozi entitled "Attribution

Demo Video Attached." with a video file attached that captures details of EMS' confidential Cross Channel Marketing Platform without the EMS logo (See July 18, 2014 Email, a copy of which is attached as Exhibit 28).

### Lehman Stored and Deleted Highly Confidential and Proprietary EMS Source Codes and Analytics on his Personal Computer

132.   On October 6, 2014, Lehman emailed Thomas and Watkins regarding the tasks Thomas was working on for Thorium. Lehman wrote "Attribution is a Thorium initiative where we'll opportunistically leverage partners where we're mutually valuable to each other . . . Do we have some way for you to see the EMS product?" (See October 6, 2014 Email, a copy of which is attached as Exhibit 29).

133.   On or about October 7, 2014, 147 .java files containing an EMS source code that is consistent with EMS' Attribution model, a unique and highly confidential algorithm used by EMS in analyzing client data, were copied onto Lehman's desktop computer.

134.   On January 5, 2015, as a result of its investigation into Lehman's activities, EMS terminated ten U.S. employees and commenced investigations into five EMS employees based in the UK who were associated with Thorium, including Behrozi, Ghahary, Cowie, Wan, and Frisch. EMS also suspended Watkins' for cause (these terminations and investigations are collectively referred to as the "January Terminations").

135.   On January 5, 2015 at 8:11 p.m., after receiving notice of the January Terminations, Ghahary emailed Behrozi, Thomas, Lehman, and Watkins and wrote: "Since you [Behrozi] have the time, oh wait so do I, can you go through and lockdown all the assets with new passwords and restrictions on the google drive." (See January 5, 2015 Email, a copy of which is attached as Exhibit 30).

136.   On January 6, 2015 at 4:42 a.m., all 147 .java files on Lehman's personal computer that had been transferred onto it on October 7, 2014 were deleted.

137.   A large number of other files were also deleted at 4:42 a.m. on January 6, 2015 from Thorium's Google Drive account.

138.   On information and belief, Lehman copied the contents of his personal computer and Google Drive to another device and/or cloud storage system before deleting the information on January 6, 2015.

<b>Lehman Sent EMS Proprietary and Confidential Information to<br/>Potential Thorium Clients</b>

139.   On October 9, 2014, Lehman and Watkins, on behalf of Thorium, set up a meeting with several IIS representatives to discuss response attribution analytics. In order to provide IIS with an overview of what response attribution analytics are, Lehman provided the IIS representatives with links to EMS' website. (See October 9, 2014 Email, a copy of which is attached as Exhibit 31).

140.   On October 10, 2014 at 3:30 p.m., in preparation for the meeting with IIS regarding response attribution, Lehman emailed Watkins and wrote: "On marketing attribution, we need to first reassure [IIS] that we know the space well. Then we need to create a business plan including a request for market development funding from HP. Do we have more detailed docs from Experian that we can share with them?" (See October 10, 2014 Email, a copy of which is attached as Exhibit 32).

141.   Later on October 10, 2014, Lehman sent another email to Watkins writing "Just a reminder that sharing docs on the Experian solution is one step to reassuring them that we know this space well." (See October 10, 2014 Email, a copy of which is attached as Exhibit 33).

142.   Also on October 10, 2014, Watkins responded to Lehman's request and attached documents to an email, writing "would you mind sifting through & picking what you want to send on?" (See Exhibit 33).

143.   On October 10, 2014 at 7:23 p.m., Lehman sent four documents to the IIS representatives he was planning on meeting the following week. (See October 10, 2014 Email, a copy of which is attached as Exhibit 34).

144.   Two of the documents Lehman sent to IIS in the October 10th 7:23 p.m. email ("Statistical Attribution" and "Response Attribution Explained") were EMS documents containing EMS proprietary and confidential information and trade secrets.

145.   On October 10, 2014 at 7:24 p.m., Lehman forwarded Exhibit 34, including the attachments, to Harvey Pass from IIS. (See October 10, 2014 Email, a copy of which is attached as Exhibit 35).

146.   On October 23, 2014, Lehman emailed Debbie Burke of HP EMS' "Response Attribution Explained" document and provided a link to EMS' website describing response attribution. (See October 23, 2014 Email, a copy of which is attached as Exhibit 36).

147.   Lehman wrote: "For digital marketing, we'll build on our prior experience with response attribution, which quantifies how digital marketing actions and investments influence consumer behavior. Our team previously built a response attribution product at Experian[.]" (See Exhibit 36).

148.   On October 24, 2014, Lehman emailed EMS employees Gareth Edge ("Edge") and Watkins. Jeremy asks for Edge's help with coming up with an "attribution offering that fully unleashes the team's creativity" because the Thorium team will not be limited by "direct mail perspectives, backward compatibility of sorts with DMS mainframe, or dinosaur product

mangers clinging to what they know with fractional attribution. We'll take the math well beyond current offerings starting with the algorithmic approaches the team has already envisioned, and then further to deep learning techniques." (See October 24, 2014 Email, a copy of which is attached as Exhibit 37).

149. Copies of other proprietary and confidential EMS materials were found on Lehman's desktop computer as of March 15, 2015, which he had provided to EMS. These include screenshots of EMS' User Interface for its marketing attribution product, a different version of the "Statistical Attribution" document; and an EMS PowerPoint Presentation dated October 7, 2014 titled "MA Fractional Methodology. Copies of these documents are attached, respectively, as Exhibits 38, 39, and 40.

150. Metadata recovered from Lehman's desktop computer show that the documents in the paragraph above were copied onto Lehman's personal computer on October 10, 2014.

151. These documents contain EMS confidential and proprietary information and trade secrets.

152. In particular, Exhibit 40 describes EMS' algorithm and method for measuring marketing attribution within its Cross Channel Marketing Platform, a feature that is currently live in production in a beta stage with current EMS clients.

### Lehman Used EMS Materials and Confidential Information in PowerPoint Presentations Promoting Thorium

153. On July 31, 2014 Ghahary emailed Lehman and Thomas a "Thorium Capabilities Deck" PowerPoint which contains confidential and proprietary EMS information. (See July 31, 2014 Email, a copy of which is attached as Exhibit 41).

154. On August 3, 2014, Lehman responded to Ghahary's email in Exhibit 41: "Salar, we can expect this deck to be seen by Experian people. Are the graphics on slide 4 and 12

directly or partially from Experian? If so we need to rework these, please." (See August 3, 2014 Email, a copy of which is attached as Exhibit 42).

155.    On August 3, 2014, Ghahary responded to Lehman's email: "Yes, slides 4 and 12 are directly from Experian work. I will have to create our own versions. In the meantime, I added two other graphical slides (both are my own creations). One was created for Thorium directly and the other was a [sic] older dashboard I created for Experian with only your eyes on it previously (unless you shopped it around)". (See Exhibit 42).

156.    On September 15, 2014, Lehman emailed Walter Maguire from HP in advance of an upcoming call Lehman had scheduled with Walter Maguire. Lehman attached a PowerPoint containing Exhibit 41's original slides 4 and 12, which Ghahary had admitted came "directly from Experian work." (See September 15, 2014 Email, a copy of which is attached as Exhibit 43).

157.    Debbie Burke of HP circulated a calendar appointment for a meeting scheduled on September 17, 2014 at HP's offices. (See Calendar Appointment, a copy of which is attached as Exhibit 44). Attached to the calendar invitation was a PowerPoint containing Exhibit 41's original slides 4 and 12, which Ghahary had admitted came "directly from Experian work." (See Exhibits 41 and 44).

158.    On December 8, 2014, Lehman emailed Chuck Lloyd from HP, pitching Thorium's services. Lehman attached a PowerPoint to this email containing the image from Exhibit 41's original slide 4, which Ghahary had admitted came "directly from Experian work." (See December 8, 2014 Email, a copy of which is attached as Exhibit 45).

**EMS Source Code Was Stored On Other Thorium Employees' Computers**

159.    Behrozi returned his EMS-issued computer in connection with his termination in January 2015. EMS' forensic investigators located EMS proprietary source code saved in a folder on the hard drive titled "Thorium" located on Behrozi's EMS-issued computer.

160.    Sergey Vladimirov retained his EMS-issued computer after his termination despite repeated requests to return the property to EMS.

161.    When the EMS computer was ultimately recovered from Vladimirov, EMS' forensic investigators found that Vladimirov had attempted to wipe the hard drive of the EMS computer. Despite having attempted to wipe the hard drive, EMS' forensic investigators were able to locate the source code for Conversen, a product that EMS had previously purchased from Vladimirov, on the hard drive of the computer.

162.    On information and belief, Vladimirov copied the contents of the hard drive to another device before wiping the hard drive and returning it to EMS.

163.    On or about February 9, 2015, after receiving EMS' cease and desist letter dated January 22, 2015, Lehman drafted a document on his computer titled "Facts and Response to EMS Claim," a copy of which is attached as Exhibit 46.

164.    In this document, Lehman wrote: "Watkins apparently copied source code from an EMS product into the Google drive." (See Exhibit 46).

**Lehman Failed to Return EMS Property**

165.    Upon leaving EMS, Lehman did not return his EMS-issued laptop.

166.    In October 2014, Lehman returned his EMS-issued laptop but had removed the hard drive of the laptop before returning the laptop to EMS.

167.    On October 31, 2014, Morella Carta ("Carta") from EMS emailed Lehman and wrote "We received your laptop but the hard drive is missing. Pls send it directly to my attention at your earliest convenience." (See October 31, 2014 Email, a copy of which is attached as Exhibit 47).

168.    On November 4, 2014, Carta had not received a response from Lehman and sent a follow up email again asking for Lehman to return the hard drive. (See Exhibit 47).

169.    On November 10, 2014, Lehman responded "I'll be in NYC next week and can bring the SSD [solid state drive] by 29 Broadway." (See Exhibit 47).

170.    As of November 19, 2014, EMS had not yet received the hard drive. On November 19, 2014 Carta wrote to Lehman "We still have not received the hard drive. This situation has escalated to higher levels and it is unacceptable. We appreciate if you could send it today to my attention." (See November 19, 2014 Email, a copy of which is attached as Exhibit 48).

171.    On November 21, 2014, Lehman responded "I'm sorry - simply forgot to bring that to NYC this week. Please pardon me for creating work for you over something like a hard drive. I can have a check or wire sent for the value of the drive today, or can mail the drive when I'm back home this weekend. What's easier for you?" (See Exhibit 48).

172.    On November 21, 2014, Watkins wrote an email to Lehman: "What's your home address, I'll send this to you. It's a laptop hard drive which I've imaged with an EXPN build and messed with the dates on safe boot to cause it to lock. So if you boot up from it, it's clearly EXPN but you can't read anything from it?? .. Like who logged on when etc." (See November 21, 2014 Email, a copy of which is attached as Exhibit 49).

30

173.    Later on November 21, 2014, Lehman responded to Watkins "Please have it expedited ASAP. Our friend is threatening action now. Will reimburse." (See Exhibit 49).

174.    Watkins responded that "I just mailed it the fasted airmail service they do." (See Exhibit 49).

175.    On November 21, 2014, Lehman responded to Watkins asking "Would it be less risky just to use Dban to truly wipe it? Would not be good to inadvertently drag you into this if they get past safe boot changes and connect the drive to you." Watkins responded "Maybe yeah..Fdisk should also work since it was encrypted with safe boot. And just copy some big files onto it." (See November 21, 2014 Email, a copy of which is attached as Exhibit 50).

176.    On November 25, 2014, Lehman emailed Carta and said that he was mailing the hard drive that day. (See November 25, 2014 Email, a copy of which is attached as Exhibit 51).

177.    On November 27, 2014 at approximately 6:57 a.m., Lehman and Watkins engaged in a Skype chat. Watkins asked "Did the hard drive show up yet?" Lehman responded "Yes, I had it wiped to DoD standard and mailed it on. Probably should have put 1000 kitten pictures on it first". Watkins responded "Good to send them a shitty drive back, not the ssd". (See November 27, 2014 Skype Chats, a copy of which is attached as Exhibit 52).

178.    On December 2, 2014, Carta confirmed to Lehman that EMS had received the hard drive. (See December 2, 2014 Email, a copy of which is attached as Exhibit 53).

179.    On February 1, 2015, Lehman admitted to EMS that he had intentionally deleted all data from the hard drive before returning it to EMS. (See February 1, 2015 Email, a copy of which is attached as Exhibit 54).

180.    On information and belief, Lehman copied the contents of the hard drive to another device before wiping the hard drive and returning it to EMS.

181.    Upon receiving the hard drive from Lehman, EMS' internal forensic investigation department conducted a damage assessment on the hard drive and found that Lehman had permanently deleted files, altered or erased files, programs, usage history, and other data from the hard drive.

182.    EMS' forensic investigator's investigated, analyzed and attempted to recover destroyed data and information from the hard drive returned by Lehman.

**Lehman and Thorium Solicited and Paid EMS Employees to Perform Work for Thorium While They Were Still Employed by EMS**

183.    On or about June 30, 2014, Lehman, Behrozi, Wan, Cowie, Watkins, Thomas and Ghahary engaged in an email conversation about Thorium's use of an in-memory database called "VoltDB." (See June 30, 2014 Email, a copy of which is attached as Exhibit 55).

184.    In the course of this email conversation, Lehman suggested inviting an EMS employee, Govind Asawa, to a meeting regarding VoltDB. Behrozi responded "I'm VERY hesitant to involved [sic] Govind at this point. He has a very close relationship with Manoj [Khanwalkar] and might put some current Experian employees at risk." (See Exhibit 55).

185.    Lehman responded "[Govind] wants a plan B, and prefers a clean cut to leave Experian completely. I asked if he wanted a big data warehousing or Oracle project, which are his main areas. His response was basically he wants to end the current uncertainty, do something interesting and concrete, and get on any larger/more secure project." (See Exhibit 55).

186.    On September 17, 2014, Lehman forwarded an email from EMS employee Mark Frisch to Thomas, regarding digital marketing for retail banks. Lehman asked Thomas to "work with Mark to see if he can create something usable". Thomas responds "sure no issues I will call him this afternoon to work on this." (See September 17, 2014 Email, a copy of which is attached as Exhibit 56).

187.    On October 23, 2014, Behrozi circulated a draft email regarding a Thorium information session and training, including Vertica training, scheduled for October 29, 2014 in New York, New York. (See October 23, 2014 Email, a copy of which is attached as Exhibit 57).

188.    Several EMS employees attended this meeting, including Watkins, Behrozi, Ghahary, and Wan, despite the fact that it took place on a workday during EMS work hours.

189.    On November 5, 2014, Experian employee Sarah Litt ("Litt") sent Thorium an invoice for $1,827.50, a copy of which is attached as Exhibit 58.

190.    Thorium received revenue by performing work for its client, Deutsche Bank.

191.    Contractors to Thorium, including a company owned by Salar Ghahary called Cevant Design Group, performed work and/or services for Thorium's client Deutsche Bank. For example, Monika Jakober, provided services to Thorium, via Cevant Design Group, for work done on Deutsche Bank's behalf. A copy of Jakober's invoice is attached as Exhibit 59.

192.    Thorium also compensated Behrozi, Thomas, Vladimirov, Cowie, Wan, Ghahary, and Watkins for their services to Thorium while they were still EMS employees.

193.    On December 4, 2014, Ghahary circulated a list of Thorium partners and employees.  Several of the individuals listed as Thorium employees were employed by EMS. (See December 4, 2014 Email, a copy of which is attached as Exhibit 60).

### Thorium is a Direct Competitor of Experian Marketing Solutions

194.    Lehman and Thorium are directly competitive with EMS.

195.    Thorium has used EMS source codes and analytics and EMS confidential and proprietary information and trade secrets in developing and promoting Thorium.

196.    In approximately September 2014, Monique Lehman (Lehman's sister) assisted Lehman and Thorium on a project based in Eastern Europe.

197.    On September 16, 2014, Monique Lehman emailed Lehman: "So basically we are making a Polish Experian?" Lehman responded: "Experian for some reason has somewhat pulled out of EMEA markets for data and analytics. So the answer is kind of sort of?" (See September 16, 2014 Email, a copy of which is attached as Exhibit 61).

198.    On December 11, 2014, Lehman emailed Watkins stating: "Idea: Experian has those outsourced data warehouses for clients like LBI and Boston Proper. It's a very sticky business, e.g., it's not like these clients can just decide one day to build their own. Experian has brought zero innovation to this area and has already considered ways to move out of that business." (See December 11, 2014 Email, a copy of which is attached as Exhibit 62).

199.    On December 12, 2014, Lehman wrote further: "I'm only suggesting that EXPN may possibly dispose of some good clients for discount rates." (See Exhibit 62).

### Lehman and Thorium Attempted to Conceal the Fact that Thorium is a Competitor of EMS

200.    Lehman and Thorium concealed Thorium's existence, Lehman and Thorium's solicitation of EMS employees, Thorium's competitiveness with EMS, and the performance of Thorium work during EMS work hours and use of EMS resources.

201.    EMS employees that were working for Lehman and Thorium regularly used thorium3.com email addresses to conduct Thorium business.

202.    On October 23, 2014, Behrozi emailed Watkins, Lehman, Wan, Ghahary and Thomas regarding an upcoming Thorium team meeting. (See October 23, 2014 Email, a copy of which is attached as Exhibit 57).

203.    In this email, Behrozi wrote: "I'm sensitive to my name or any current Experian persons name if we have Experian people attending. Am I just being over-cautious? Specifically,

34

the email below could circulate….so I'd like to limit who we send it to, or remove my name."
(See Exhibit 57).

204. On November 12, 2014, Lehman emailed Watkins in advance of a meeting Watkins was having the next day with EMS management, at which Watkins expected to be given notice of being laid off. (See November 12, 2014 Email, a copy of which is attached as Exhibit 63).

205. In order to counsel Watkins not to reveal the work he and others were doing for Thorium, Lehman counseled Watkins: "They are likely to ask you directly if others are working in parallel now. Again, considered honesty can work: we are in early stages and it's mostly discussions." (See Exhibit 63).

## LEHMAN AND THORIUM HAVE ENGAGED IN SPOLIATION OF EVIDENCE

### Lehman Admitted to Deleting his EMS Hard Drive Before Returning it to EMS

206. Before returning his EMS issued hard drive to EMS, Lehman told Watkins via Skype chat that he "had it wiped to DoD standard and mailed it on." (See Exhibit 52).

207. On February 1, 2015, Lehman admitted to EMS that he had intentionally deleted all data from the hard drive before returning it to EMS. (See Exhibit 54).

### After Learning of the January Terminations, Thorium Engaged in Widespread Deletion of Data

208. After learning of the January Terminations, on January 6, 2015 at 4:42 a.m., all 147 .java files containing EMS source code on Lehman's computer were deleted.

209. A large number of files were deleted at 4:42 a.m. on January 6, 2015 from Thorium's Google Drive account.

### After Learning of A Potential Lawsuit, Thorium Transferred its Data
### From the United States to the United Kingdom

210.    On May 21, 2014 Salar Ghahary registered the domain "thorium3.com" with web.com. (See Exhibit 14).

211.    On July 16, 2014, Watkins (who is based in the United Kingdom) emailed Lehman, Behrozi and Thomas and explained that his accountant suggested the creation of a UK based entity to be known as Thorium Data Science Ltd. for accounting purposes. (See July 16, 2014 Email, a copy of which is attached as Exhibit 64).

212.    Prior to the creation of Thorium Data Science Ltd., Watkins operated a Thorium business in the United Kingdom through an entity known as TW Technologies Ltd. (See Exhibit 64).

213.    Thorium Data Science Ltd. filed its certificate of incorporation on December 11, 2014, a copy of which is attached as Exhibit 65.

214.    On January 29, 2015, one week after Lehman received EMS' initial cease and desist letter (Exhibit 5), and after he spoke with EMS counsel and agreed to work with EMS to provide information indicating his and Thorium's "innocence", the registrar of the domain "thorium3.com" was changed from Ghahary in the United States to Thorium Data Science Ltd. in the United Kingdom, with Watkins listed as the administrator. (See January 29, 2015 Web.com, a copy of which is attached as Exhibit 66).

215.    On February 11, 2015, in response to EMS' request that it be provided certain information, including access to the emails and other information in the thorium3.com domain, in order to evaluate Lehman's contention that he and his company had not engaged in wrongdoing, Lehman responded: "Some of the requested items are not accessible to or managed by myself or my company Thorium Data Science LLC. The cloud storage on Google Drive that

Experian has accessed, and the web sites on Network Solutions are managed by Trevor Watkins for his UK companies named TW Technologies Limited and Thorium Data Science Limited. I am not part of these companies." (See February 11, 2015 Email, a copy of which is attached as Exhibit 67).

216.    On March 12, 2015, when Lehman and Thorium were purportedly cooperating with EMS to demonstrate that they did not engage in wrongdoing, Watkins claimed he was unable to provide thorium3.com emails to EMS because doing so would violate UK data privacy laws. (See March 12, 2015 Email, a copy of which is attached as Exhibit 68).

<strong>Lehman Continues to Delete and Threaten to Delete Data</strong>

217.    Lehman and Thorium have continued to engage in hiding, concealing, and destroying data relevant to this litigation.

218.    On February 9, 2015, when Lehman and Thorium were purportedly cooperating with EMS to provide EMS with information demonstrate that they did not engage in wrongdoing and EMS was requesting access to Thorium's servers (known as .git, .jira, and .confluence), Watkins informed Lehman via Skype chat that "Lewis and I have just been fixing up the GIT, JIRA and CONFLUENCE server." (See February 9, 2015 Skype Chats, a copy of which is attached as Exhibit 69).

219.    On February 18, 2015, when Lehman and Thorium were purportedly cooperating with EMS to provide EMS with information demonstrate that they did not engage in wrongdoing, Watkins emailed Lehman and said that he moved Thorium's website source code from Google Drive to git.thorium3.com. Lehman responded "Nice progress!" (See February 18, 2015 Email, a copy of which is attached as Exhibit 70).

220.     On March 19, 2015, Lehman agreed to provide Navigant with access to several of his personal email accounts so that Navigant could capture and store the data within those accounts. Lehman told Navigant that once the data was copied by Navigant, Lehman intended to delete the accounts entirely. (See March 19, 2015 Email, a copy of which is attached as Exhibit 71).

221.     When Navigant reviewed the data produced by Lehman, they found that Lehman had "produced" his thorium3.com email account, but that it only contained very few emails, indicating that he Lehman likely deleted emails before providing EMS with access to them.

### COUNT I

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C. § 1030 *et seq.*)
### (Lehman and Thorium)

222.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein.

223.     EMS' networks, environments, and hard drives are password protected. A limited number of EMS employees have access to these systems to access source codes, marketing strategies, and other confidential and proprietary and trade secret information.

224.     EMS' computer systems are used in interstate and foreign commerce and communications and are "protected computers" as defined in 18 U.S.C. § 1030(e)(2).

225.     While employed by EMS, Lehman was not authorized by EMS to delete, overwrite or otherwise remove any programs, databases, source codes, or files from EMS' computer system.

226.     While employed by EMS, Lehman was not authorized to access and/or use EMS' confidential information at any time and for any purpose other than for a legitimate EMS

business purpose. By accessing confidential and proprietary information for a competitive purpose, Lehman violated the Employee Agreement and EMS' Global Code of Conduct and the Information Security Agreement, and such activity was not authorized by EMS.

227.    After Lehman's employment ended, he was not authorized to access any EMS file or computer system.

228.    For the four months after Lehman's termination from EMS during which he retained and did not return his EMS-issued computer in violation of his Employee Agreement, Settlement Agreement, and EMS' Global Code of Conduct, Lehman's access to the EMS-issued computer was not authorized by EMS.

229.    For the five months after Lehman's termination from EMS that Lehman retained the EMS-issued hard drive in violation of his Employee Agreement, Settlement Agreement, and EMS' Global Code of Conduct, Lehman's access to the hard drive was not authorized by EMS.

230.    When Lehman wiped his EMS-issued hard drive before returning it to EMS, he caused the transmission of a code or command, and intentionally caused damage to EMS' protected computer as a result of the code or command.

231.    Thorium was never authorized by EMS to access any EMS file or computer system.

232.    When Lehman, on behalf of Thorium, instructed Watkins to access EMS computers and send Lehman documents containing EMS source code and confidential information, and Watkins sent Lehman and Thorium documents containing EMS source code and confidential information, Lehman and Thorium were accessing EMS' computer system without authorization.

233. When Watkins copied EMS source code onto Thorium's Google Drive account, Thorium accessed EMS' computer system without authorization.

234. When Lehman, on behalf of Thorium, instructed Behrozi to access EMS computers and send Lehman documents purchased by and belonging to EMS, and Behrozi sent Lehman and Thorium documents purchased by and belonging to EMS, Lehman and Thorium were accessing EMS' computer system without authorization.

235. When Behrozi and Vladimirov stored EMS source code and confidential information on their computers for the benefit of Thorium, and Lehman and Thorium accessed and benefited from Behrozi and Vladimirov's retention of that source code and confidential information, Lehman and Thorium were accessing EMS' computer system without authorization.

236. Through these actions, Lehman and Thorium have:

    (a)    Intentionally accessed the EMS computer system without authorization or exceeded their authorized access to obtain information from EMS' protected computer in violation of 18 U.S.C. § 1030(a)(2)(C);

    (b)    Knowingly and with intent to defraud, accessed EMS' protected computer without authorization or exceeded his authorized access, and by means of such conduct, furthered the intended fraud and obtained valuable information resulting in damage exceeding $5000.00 in violation of 18 U.S.C. § 1030(a)(4);

    (c)    Knowingly caused the transmission of a program, information, code or command, and as a result of such conduct, intentionally caused damage to EMS' protected computer in violation of 18 U.S.C. § 1030(a)(5)(A);

237. EMS' internal forensic investigation department conducted a damage assessment on the hard drive returned by Lehman and found that Lehman had permanently deleted files, altered or erased files, programs, usage history, and other data from the hard drive.

238.     EMS' forensic investigator's investigated, analyzed and attempted to recover destroyed data and information from the hard drive returned by Lehman. The investigators found that Lehman caused impairment to the integrity or availability of data on the hard drive.

239.     EMS hired Navigant Consulting to perform additional damage assessments on data accessed by Lehman and other EMS employees performing work for Thorium and/or EMS data provided by EMS employees to Lehman and/or Thorium.

240.     Navigant's investigation revealed Lehman had accessed directly or through others EMS source code and EMS confidential and proprietary information and trade secrets.

241.     Navigant investigated, analyzed and attempted to recover deleted data and information from Lehman's files. Navigant found that Lehman caused impairment to the integrity or availability of data in the files.

242.     As a result of Lehman's and Thorium's conduct as alleged above, EMS suffered damages and/or loss exceeding at least $5,000 and because its remedy at law is inadequate or incomplete, seeks injunctive relief to recover and protect its information, its goodwill, and other legitimate business interests.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)     Permanently enjoin Thorium and Lehman from using any of EMS' proprietary and confidential information and trade secrets in any manner.

(b)     Permanently enjoin Thorium and Lehman from directly or indirectly divulging any of EMS' proprietary and confidential information or trade secrets to anyone.

(c)     Order that Thorium and Lehman be required to return to EMS proprietary and confidential information and trade secrets, including but not limited to all documents, source codes, computer programs, materials, software, data, materials and other things containing EMS'

confidential information or trade secrets in its possession, custody, or control, and destroy any remaining such information in their possession, custody, or control.

      (d)    Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman, and other former EMS employees currently or formerly employed by Thorium, learned or developed for EMS while working as employees for EMS.

      (e)    Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman and Thorium developed by using or referring to EMS' confidential information or trade secrets.

      (f)    Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

      (g)    Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

      (h)    Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest, and third party forensic experts' fees and interest pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq.

      (i)    Grant such other and further relief as this Court may deem just and appropriate.

## COUNT II

## ACTUAL AND/OR THREATENED MISAPPROPRIATION OF TRADE SECRETS (MICHIGAN UNIFORM TRADE SECRET ACT, MICH. COMP. LAWS § 445.1901)
### (Lehman and Thorium)

243.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein.

244.    EMS' confidential and proprietary information includes, inter alia, EMS' source codes, research and development activities and efforts, products, operations, marketing strategies, algorithms, marketing services technologies and products, platforms, software, and code, business plans, and business strategies.

245.    This information constitutes trade secrets, pursuant to the Michigan Uniform Trade Secret Act, Mich. Comp. Laws § 445.1901, et seq., because EMS derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value of its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

246.    Lehman and Thorium actually misappropriated and/or threaten to inevitably misappropriate EMS' trade secrets without its consent, in violation of Michigan law. Thorium has built products and offered services to third parties based on EMS' source code and trade secrets.

247.    Lehman and Thorium have explicitly acknowledged their use of EMS' trade secrets in documents sent to potential Thorium partners and clients.

248. Lehman and Thorium have explicitly requested then-current EMS employees send Lehman and Thorium EMS' confidential information and trade secrets so that Lehman and Thorium could use that information in marketing and promoting Thorium with third parties.

249. Defendants will be or are being unjustly enriched by the misappropriation of EMS' trade secrets and/or confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate its trade secrets and confidential information.

250. Defendants' actual and/or threatened misappropriation has been willful and malicious. Lehman took deliberate and repeated steps to hide his actions and efforts to move EMS' trade secrets from EMS to Thorium, and to deceive EMS.

251. Lehman also violated his Employee Agreement and Settlement Agreement by retaining and/or utilizing EMS' trade secrets and confidential information after his termination and refusing to return such confidential information upon its demand.

252. As a result of Lehman's and Thorium's actual and threatened misappropriation of EMS' trade secrets, it has been injured and faces irreparable injury. EMS is threatened with losing customers, its trade secrets, and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this Court.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)     Permanently enjoin Thorium and Lehman from using any of EMS' proprietary and confidential information and trade secrets in any manner.

(b)     Permanently enjoin Thorium and Lehman from directly or indirectly divulging any of EMS' proprietary and confidential information or trade secrets to anyone.

(c) Order that Thorium and Lehman be required to return to EMS proprietary and confidential information and trade secrets, including but not limited to all documents, source codes, computer programs, materials, software, data, materials and other things containing EMS' confidential information or trade secrets in its possession, custody, or control, and destroy any remaining such information in their possession, custody, or control.

(d) Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman, and other former EMS employees currently or formerly employed by Thorium, learned or developed for EMS while working as employees for EMS.

(e) Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman and Thorium developed by using or referring to EMS' confidential information or trade secrets.

(f) Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(g) Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(h) Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest pursuant to the Michigan Uniform Trade Secret Act, Mich. Comp. Laws § 445.1901, et seq.

(i) Grant such other and further relief as this Court may deem just and appropriate.

## COUNT III

### BREACH OF CONTRACT BY DEFENDANT LEHMAN BOTH DURING AND FOLLOWING HIS EMPLOYMENT BY EMS
**(Employee Agreement – Confidentiality Provision)**

253.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein.

254.    On or about July 11, 2011, Defendant Lehman entered into the Employee Agreement, which is valid and enforceable.

255.    EMS has fully performed all conditions, covenants and promises in the Employee Agreement.

256.    As an Executive Vice President for Global Product Development and Delivery, Lehman was privy to non-public EMS information, including source code, programs, and marketing technology.

257.    Defendant Lehman, as an employee of EMS, was under obligations pursuant to the Employee Agreement to maintain in confidence non-public information of EMS and to not use such information for his own benefit.

258.    Lehman breached his obligations under the Employee Agreement by retaining on his personal computer and other devices EMS' confidential and proprietary and trade secret information following termination of his employment.

259.    To the extent that Lehman used and uses EMS confidential and trade secret information in developing and promoting Thorium both during and following his employment, Lehman has breached is obligation as stated in the Employee Agreement to maintain in confidence non-public information of EMS.  EMS has not consented to Thorium's use of its confidential and non-public information.

46

260.   The Employee Agreement provides for EMS' reasonable attorney fees if it prevails in enforcing any terms of the Employee Agreement.

261.   Lehman's breaches of the Employee Agreement have caused, and will continue to cause, irreparable harm to EMS unless restrained and enjoined by this Court.

262.   In addition, EMS already has been damaged by certain of Lehman's breaches in an amount in excess of $75,000, including but not limited to amounts paid to Lehman as severance and redundancy payments, including a $250,000 lump sum payment and prorated stock options, at the same time Lehman was engaging in misconduct to the detriment of EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)   Permanently enjoin Thorium and Lehman from using any of EMS' proprietary and confidential information and trade secrets in any manner.

(b)   Permanently enjoin Thorium and Lehman from directly or indirectly divulging any of EMS' proprietary and confidential information or trade secrets to anyone.

(c)   Order that Thorium and Lehman be required to return to EMS proprietary and confidential information and trade secrets, including but not limited to all documents, source codes, computer programs, materials, software, data, materials and other things containing EMS' confidential information or trade secrets in its possession, custody, or control, and destroy any remaining such information in their possession, custody, or control.

(d)   Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman, and other former EMS employees currently or formerly employed by Thorium, learned or developed for EMS while working as employees for EMS.

47

(e)    Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman and Thorium developed by using or referring to EMS' confidential information or trade secrets.

(f)    Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(g)    Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(h)    Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest as provided by the Employee Agreement.

(i)    Grant such other and further relief as this Court may deem just and appropriate.

## COUNT IV

### BREACH OF CONTRACT BY DEFENDANT LEHMAN BOTH DURING AND FOLLOWING HIS EMPLOYMENT BY EMS
### (Employee Agreement – Employee Non-Solicitation Provision)

263.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein.

264.    On or about July 11, 2011, Defendant Lehman entered into the Employee Agreement, which is valid and enforceable.

265.    EMS has fully performed all conditions, covenants and promises in the Employee Agreement.

266.    Under the Employee Agreement, Lehman was restricted for 12 months following his termination from soliciting, inducing, or encouraging EMS employees to terminate their employment with EMS or accept employment with any competitor of EMS.

48

267.   Lehman breached his obligations under the Employee Agreement by soliciting, inducing, encouraging, and paying EMS employees to accept employment with Thorium, a direct competitor of EMS, both during and following his employment by EMS.

268.   Lehman further breached his obligations under the Employee Agreement by using non-public EMS including source code, programs, and marketing materials in soliciting customers on behalf of himself and Thorium.

269.   The Employee Agreement provides for EMS' reasonable attorney fees if it prevails in enforcing any terms of the Employee Agreement.

270.   Lehman's breaches of the Employee Agreement have caused, and will continue to cause, irreparable harm to EMS unless restrained and enjoined by this Court.

271.   In addition, EMS already has been damaged by certain of Lehman's breaches in an amount in excess of $75,000, including but not limited to amounts paid to Lehman as severance and redundancy payments, including a $250,000 lump sum payment and prorated stock options, at the same time Lehman was engaging in misconduct to the detriment of EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)   Permanently enjoin Thorium and Lehman from directly or indirectly soliciting any of EMS' employees in any manner for twelve months following the date in entry of the injunction.

(b)   Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman, and other former EMS employees currently or formerly employed by Thorium, learned or developed for EMS while working as employees for EMS.

49

(c)     Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(d)     Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(e)     Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest as provided by the Employee Agreement.

(f)     Grant such other and further relief as this Court may deem just and appropriate.

## COUNT V

### BREACH OF CONTRACT BY DEFENDANT LEHMAN BOTH DURING AND FOLLOWING HIS EMPLOYMENT BY EMS
(Employee Agreement – Non-Competition Provision)

272.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein.

273.    On or about July 11, 2011, Defendant Lehman entered into the Employee Agreement, which is valid and enforceable.

274.    EMS has fully performed all conditions, covenants and promises in the Employee Agreement.

275.    Under the Employee Agreement, Lehman was restricted during his employment and for 12 months following his termination from engaging in any venture competitive to the work that he had performed for EMS, if he was terminated for any reason except termination by EMS without cause.

276.    Lehman was terminated for misconduct.

50

277. Lehman breached his obligations under the Employee Agreement by forming Thorium, an entity in direct competition with EMS Marketing Services both during his employment and after his employment with EMS terminated.

278. The Employee Agreement provides for EMS' reasonable attorney fees if it prevails in enforcing any terms of the Employee Agreement.

279. Lehman's breaches of the Employee Agreement have caused, and will continue to cause, irreparable harm to EMS unless restrained and enjoined by this Court.

280. In addition, EMS already has been damaged by certain of Lehman's breaches in an amount in excess of $75,000, including but not limited to amounts paid to Lehman as severance and redundancy payments, including a $250,000 lump sum payment and prorated stock options, at the same time Lehman was engaging in misconduct to the detriment of EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a) Permanently enjoin Lehman from violating the non-competition provision for twelve months from the date of entry of the injunction.

(b) Permanently enjoin Thorium and Lehman from using any of EMS' proprietary and confidential information and trade secrets in any manner.

(c) Permanently enjoin Thorium and Lehman from directly or indirectly divulging any of EMS' proprietary and confidential information or trade secrets to anyone.

(d) Order that Thorium and Lehman be required to return to EMS proprietary and confidential information and trade secrets, including but not limited to all documents, source codes, computer programs, materials, software, data, materials and other things containing EMS' confidential information or trade secrets in its possession, custody, or control, and destroy any remaining such information in their possession, custody, or control.

(e)     Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman, and other former EMS employees currently or formerly employed by Thorium, learned or developed for EMS while working as employees for EMS.

(f)     Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman and Thorium developed by using or referring to EMS' confidential information or trade secrets.

(g)     Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(h)     Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(i)     Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest as provided by the Employee Agreement.

(j)     Grant such other and further relief as this Court may deem just and appropriate.

## COUNT VI

### BREACH OF CONTRACT BY DEFENDANT LEHMAN BOTH DURING AND FOLLOWING HIS EMPLOYMENT BY EMS
### (Employee Agreement – Return of Property Provision)

281.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein.

282.    On or about July 11, 2011, Defendant Lehman entered into the Employee Agreement, which is valid and enforceable.

283.   EMS has fully performed all conditions, covenants and promises in the Employee Agreement.

284.   Under the Employee Agreement, Lehman promised to return all EMS property upon termination of his employment with EMS.

285.   Lehman breached his obligations under the Employee Agreement by failing to return all company property to EMS upon termination, including, for four months, his EMS-issued computer, and, permanently, all of the EMS data on the hard drive of that computer which he destroyed before returning to EMS.

286.   The Employee Agreement provides for EMS' reasonable attorney fees if it prevails in enforcing any terms of the Employee Agreement.

287.   Lehman's breaches of the Employee Agreement have caused, and will continue to cause, irreparable harm to EMS unless restrained and enjoined by this Court.

288.   In addition, EMS already has been damaged by certain of Lehman's breaches in an amount in excess of $75,000, including but not limited to amounts paid to Lehman as severance and redundancy payments, including a $250,000 lump sum payment and prorated stock options, at the same time Lehman was engaging in misconduct to the detriment of EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)   Permanently enjoin Thorium and Lehman from using any of EMS' proprietary and confidential information and trade secrets in any manner.

(b)   Permanently enjoin Thorium and Lehman from directly or indirectly divulging any of EMS' proprietary and confidential information or trade secrets to anyone.

(c)   Order that Thorium and Lehman be required to return to EMS property and proprietary and confidential information and trade secrets, including but not limited to all

documents, source codes, computer programs, materials, software, data, materials and other things containing EMS' confidential information or trade secrets in its possession, custody, or control, and destroy any remaining such information in their possession, custody, or control.

(d)     Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(e)     Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(f)     Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest as provided by the Employee Agreement.

(g)     Grant such other and further relief as this Court may deem just and appropriate.

<u>**COUNT VII**</u>

<u>**BREACH OF CONTRACT BY DEFENDANT LEHMAN**</u>
**(Settlement Agreement – Confidentiality Provision)**

289.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein

290.     On or about April 25, 2014, Defendant Lehman entered into the Settlement Agreement, which is valid and enforceable.

291.     EMS has fully performed all conditions, covenants and promises in the Settlement Agreement.

292.     As an Executive Vice President for Global Product Development and Delivery, Lehman was privy to non-public EMS information including source code, programs, and marketing technology.

293.    Defendant Lehman, as an employee of EMS, was under obligations pursuant to the Settlement Agreement to maintain in confidence non-public information of EMS and to not use such information for his own benefit.

294.    To the extent that Lehman used and uses EMS confidential information in developing and promoting Thorium, Lehman has breached his obligation as stated in the Settlement Agreement to maintain in confidence non-public information of EMS.  EMS has not consented to Thorium's use of its confidential and non-public information.

295.    Lehman's breaches of the Employee Agreement have caused, and will continue to cause, irreparable harm to EMS unless restrained and enjoined by this Court. If EMS' confidential and proprietary information is further disclosed, the damage to EMS' businesses would be immeasurable.

296.    As agreed to in the Settlement Agreement, EMS is entitled to attorneys' fees and costs incurred in the enforcement of this action.

297.    In addition, EMS already has been damaged by certain of Lehman's breaches in an amount in excess of $75,000, including but not limited to amounts paid to Lehman as severance and redundancy payments, including a $250,000 lump sum payment and prorated stock options, at the same time Lehman was engaging in misconduct to the detriment of EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)     Permanently enjoin Thorium and Lehman from using any of EMS' proprietary and confidential information and trade secrets in any manner.

(b)     Permanently enjoin Thorium and Lehman from directly or indirectly divulging any of EMS' proprietary and confidential information or trade secrets to anyone.

55

(c)     Order that Thorium and Lehman be required to return to EMS proprietary and confidential information and trade secrets, including but not limited to all documents, source codes, computer programs, materials, software, data, materials and other things containing EMS' confidential information or trade secrets in its possession, custody, or control, and destroy any remaining such information in their possession, custody, or control.

(d)     Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman, and other former EMS employees currently or formerly employed by Thorium, learned or developed for EMS while working as employees for EMS.

(e)     Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(f)     Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(g)     Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest as provided by the Settlement Agreement.

(h)     Grant such other and further relief as this Court may deem just and appropriate.

## COUNT VIII

### BREACH OF CONTRACT BY DEFENDANT LEHMAN
### (Settlement Agreement – Employee Non-Solicitation Provision)

298.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein

299.    On or about April 25, 2014, Defendant Lehman entered into the Settlement Agreement, which is valid and enforceable.

56

300.    EMS has fully performed all conditions, covenants and promises in the Settlement Agreement.

301.    Under the Settlement Agreement, Lehman was required to comply with the restrictive covenants contained within the Employee Agreement he signed upon commencement of his employment with EMS.

302.    Under the Settlement Agreement, as it incorporated the Employee Agreement, Lehman was restricted for 12 months following his termination from soliciting, inducing, or encouraging EMS employees to terminate their employment with EMS or accept employment with any competitor of EMS.

303.    Lehman breached his obligations under the Settlement Agreement by soliciting, inducing, encouraging, and paying EMS employees to accept employment with Thorium, a direct competitor of EMS, both during and following his employment by EMS.

304.    Lehman's breaches of the Employee Agreement have caused, and will continue to cause, irreparable harm to EMS unless restrained and enjoined by this Court. If EMS' confidential and proprietary information is further disclosed, the damage to EMS' businesses would be immeasurable.

305.    As agreed to in the Settlement Agreement, EMS is entitled to attorneys' fees and costs incurred in the enforcement of this action.

306.    In addition, EMS already has been damaged by certain of Lehman's breaches in an amount in excess of $75,000, including but not limited to amounts paid to Lehman as severance and redundancy payments, including a $250,000 lump sum payment and prorated stock options, at the same time Lehman was engaging in misconduct to the detriment of EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

57

(a)     Permanently enjoin Thorium and Lehman from directly or indirectly soliciting any EMS employees for a period of twelve months following entry of the injunction.

(b)     Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman, and other former EMS employees currently or formerly employed by Thorium, learned or developed for EMS while working as employees for EMS.

(c)     Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(d)     Order Lehman to repay any monies paid to him under the Settlement Agreement.

(e)     Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(f)     Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest as provided by the Settlement Agreement.

(g)     Grant such other and further relief as this Court may deem just and appropriate.

## COUNT IX

### BREACH OF CONTRACT BY DEFENDANT LEHMAN
### (Settlement Agreement – Non-Competition Provision)

307.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein

308.    On or about April 25, 2014, Defendant Lehman entered into the Settlement Agreement, which is valid and enforceable.

309.    EMS has fully performed all conditions, covenants and promises in the Settlement Agreement.

310.   Under the Settlement Agreement, Lehman was required to comply with the restrictive covenants contained within the Employee Agreement he signed upon commencement of his employment with EMS.

311.   Under the Settlement Agreement, as it incorporated the Employee Agreement, Lehman was restricted during his employment and for 12 months following his termination from engaging in any venture competitive to the work that he had performed for EMS, if he was terminated for any reason except termination by EMS without cause.

312.   Lehman was terminated for misconduct.

313.   Lehman breached his obligations under the Settlement Agreement by forming Thorium, an entity in direct competition with EMS Marketing Services both during his employment and after his employment with EMS terminated.

314.   Lehman's breaches of the Employee Agreement have caused, and will continue to cause, irreparable harm to EMS unless restrained and enjoined by this Court. If EMS' confidential and proprietary information is further disclosed, the damage to EMS' businesses would be immeasurable.

315.   As agreed to in the Settlement Agreement, EMS is entitled to attorneys' fees and costs incurred in the enforcement of this action.

316.   In addition, EMS already has been damaged by certain of Lehman's breaches in an amount in excess of $75,000, including but not limited to amounts paid to Lehman as severance and redundancy payments, including a $250,000 lump sum payment and prorated stock options, at the same time Lehman was engaging in misconduct to the detriment of EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)      Permanently enjoin Lehman from violating the non-competition provision for twelve months from the date of entry of the injunction.

(b)      Permanently enjoin Thorium and Lehman from using any of EMS' proprietary and confidential information and trade secrets in any manner.

(c)      Permanently enjoin Thorium and Lehman from directly or indirectly divulging any of EMS' proprietary and confidential information or trade secrets to anyone.

(d)      Order that Thorium and Lehman be required to return to EMS proprietary and confidential information and trade secrets, including but not limited to all documents, source codes, computer programs, materials, software, data, materials and other things containing EMS' confidential information or trade secrets in its possession, custody, or control, and destroy any remaining such information in their possession, custody, or control.

(e)      Permanently enjoin Thorium and Lehman from selling, marketing, or developing any products or services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman, and other former EMS employees currently or formerly employed by Thorium, learned or developed for EMS while working as employees for EMS.

(f)      Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(g)      Order Lehman to repay any monies paid to him under the Settlement Agreement.

(h)      Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(i)      Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest as provided by the Settlement Agreement.

60

(j)    Grant such other and further relief as this Court may deem just and appropriate.

COUNT X

**BREACH OF CONTRACT BY DEFENDANT LEHMAN**
**(Settlement Agreement – Return of Property Provision)**

317.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein

318.    On or about April 25, 2014, Defendant Lehman entered into the Settlement Agreement, which is valid and enforceable.

319.    EMS has fully performed all conditions, covenants and promises in the Settlement Agreement.

320.    Under the Settlement Agreement, Lehman was required to deliver all company property to EMS upon termination of his employment with EMS.

321.    Lehman has breached his obligations under the Settlement Agreement by failing to return all company property to EMS upon termination, including on information and belief, copies of source code, EMS documents, and trade secrets Lehman made from EMS source code and confidential documents stored on his computer before he deleted them on January 6, 2015, and his EMS-issued hard drive before wiping and returning it to EMS.

322.    Lehman breached his obligations under the Settlement Agreement by forming Thorium, an entity in direct competition with EMS Marketing Services both during his employment and after his employment with EMS terminated.

323.    Lehman's breaches of the Employee Agreement have caused, and will continue to cause, irreparable harm to EMS unless restrained and enjoined by this Court. If EMS' confidential and proprietary information is further disclosed, the damage to EMS' businesses would be immeasurable.

324.   As agreed to in the Settlement Agreement, EMS is entitled to attorneys' fees and costs incurred in the enforcement of this action.

325.   In addition, EMS already has been damaged by certain of Lehman's breaches in an amount in excess of $75,000, including but not limited to amounts paid to Lehman as severance and redundancy payments, including a $250,000 lump sum payment and prorated stock options, at the same time Lehman was engaging in misconduct to the detriment of EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)   Permanently enjoin Thorium and Lehman from using any of EMS' proprietary and confidential information and trade secrets in any manner.

(b)   Permanently enjoin Thorium and Lehman from directly or indirectly divulging any of EMS' proprietary and confidential information or trade secrets to anyone.

(c)   Order that Thorium and Lehman be required to return to EMS all EMS property and proprietary and confidential information and trade secrets, including but not limited to all documents, source codes, computer programs, materials, software, data, materials and other things containing EMS' confidential information or trade secrets in its possession, custody, or control, and destroy any remaining such information in their possession, custody, or control.

(d)   Permanently enjoin Thorium and Lehman from selling, marketing, or developing any services that employ, or are derived from, proprietary and confidential information and trade secrets related to technology and systems and methods that Lehman, and other former EMS employees currently or formerly employed by Thorium, learned or developed for EMS while working as employees for EMS.

(e)   Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(f)      Order Lehman to repay any monies paid to him under the Settlement Agreement.

(g)      Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(h)      Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest as provided by the Settlement Agreement.

(i)      Grant such other and further relief as this Court may deem just and appropriate.

## COUNT XI

### BREACH OF CONTRACT BY DEFENDANT LEHMAN
### (Settlement Agreement – Acting in a Manner Detrimental to EMS)

326.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein

327.    On or about April 25, 2014, Defendant Lehman entered into the Settlement Agreement, which is valid and enforceable.

328.    EMS has fully performed all conditions, covenants and promises in the Settlement Agreement.

329.    Under the Settlement Agreement, Lehman was required not to act in any manner that could damage the business or reputation of EMS.

330.    As set forth above, Defendant Lehman acted in a manner detrimental to the business and reputation of EMS by, among other things, actively exploiting his position at EMS for the benefit of Defendant Thorium, by failing to disclose to EMS that he was forming a competing enterprise, by forming a competing enterprise while still employed by EMS, by using EMS' resources, time, facilities and confidential information to make preparations to compete with EMS, by soliciting coworkers to perform work for Thorium while they were still employed by EMS, by charging expenses to EMS that were incurred while acting on behalf of his own self-

interests and in Thorium's interest, and by promoting Thorium's services by disparaging EMS' products and services.

331.   In doing the acts alleged herein, Lehman has breached the Settlement Agreement.

332.   Lehman's breaches of the Employee Agreement have caused, and will continue to cause, irreparable harm to EMS unless restrained and enjoined by this Court. If EMS' confidential and proprietary information is further disclosed, the damage to EMS' businesses would be immeasurable.

333.   As agreed to in the Settlement Agreement, EMS is entitled to attorneys' fees and costs incurred in the enforcement of this action.

334.   In addition, EMS already has been damaged by certain of Lehman's breaches in an amount in excess of $75,000, including but not limited to amounts paid to Lehman as severance and redundancy payments at the same time Lehman was engaging in misconduct to the detriment of EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)   Permanently enjoin Thorium and Lehman from continuing to act in a manner detrimental to the business and reputation of EMS.

(b)   Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' actual damages as determined by the Court.

(c)   Order Lehman to repay any monies paid to him under the Settlement Agreement.

(d)   Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(e)   Award EMS its costs and expenses incurred herein, including reasonable attorneys' fees and interest as provided by the Settlement Agreement.

(f)     Grant such other and further relief as this Court may deem just and appropriate.

## COUNT XII

### BREACH OF FIDUCIARY DUTIES BY DEFENDANT LEHMAN

335.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein.

336.    As an officer of EMS in his role as an Executive Vice President for Global Product Development and Delivery, Lehman was a fiduciary of EMS and owed fiduciary duties of care, loyalty, and good faith to EMS.

337.    Defendant Lehman's fiduciary duties to EMS included, among other things, obligations to act in the best interests of EMS, not to withhold material information from EMS, and not to compete with EMS.

338.    As set forth above, Defendant Lehman breached his fiduciary duties of loyalty and good faith to EMS by, among other things, actively exploiting his position at EMS for the benefit of Defendant Thorium, by failing to disclose to EMS that he was forming a competing enterprise, by forming a competing enterprise while still employed by EMS, by using EMS' employees, resources, time, facilities and confidential information to make preparations to compete with EMS, by enticing coworkers away from EMS, and by charging expenses to EMS that were incurred while acting on behalf of his own self-interests and in Thorium's interest.

339.    Lehman therefore has actively exploited his senior executive position at EMS for personal gain and for Thorium's benefit by using his access to key employees and to confidential information with which he was entrusted as a senior executive, by hindering EMS from conducting its business, and by taking     advantage of EMS business opportunities for his personal benefit.

65

340.    EMS has been damaged by Lehman's breach of his fiduciary obligations to EMS.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)    Order that Thorium and Lehman be required to return to EMS all funds used by Thorium and then-current EMS employees when attending events to promote and/or develop Thorium.

(b)    Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' damages as determined by the Court.

(c)    Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(d)    Grant such other and further relief as this Court may deem just and appropriate.

## COUNT XIII

### TORTIOUS INTERFERENCE WITH CONTRACTS
### (Lehman and Thorium)

341.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs 1-220 as if fully stated herein.

342.    EMS employees, including but not limited to Ghahary, Vladimirov, Frisch, and Jakober executed valid employment agreements with EMS (the "Employee Agreements"). Ghahary's, Vladimirov's, Frisch's, and Jakober's Employment Agreements are attached as Exhibits 6-9.

343.    The Employee Agreements signed by Ghahary, Vladimirov, Frisch, and Jakober required the EMS employees to protect and to maintain as confidential EMS confidential and proprietary information and trade secrets.

344.    The Employee Agreements signed by Ghahary, Vladimirov, and Jakober contained non-competition clauses, restricting the EMS employees from performing work

competitive to EMS while employed by EMS and for a period following the EMS employees' employment with EMS.

345. All EMS employees, including but not limited to Ghahary, Vladimirov, Frisch, Jakober, Thomas, Cowie, Wan and Watkins, as part of the terms of their employment with EMS, were bound by the obligations set forth in EMS' Global Code of Conduct.

346. EMS' Global Code of Conduct required the EMS employees to protect and to maintain as confidential EMS confidential and proprietary information and trade secrets.

347. EMS' Global Code of Conduct further required the EMS employees to disclose any potential employment outside of EMS and obtain written approval from management prior to engaging in outside employment.

348. As a former EMS employee, Defendant Lehman was fully aware of (1) the provisions contained in the Employee Agreements related to non-competition and confidentiality and non-disclosure of EMS' confidential information and trade secrets, and (2) the EMS employees' obligations regarding confidentiality and outside employment set forth in the Global Code of Conduct.

349. Notwithstanding their knowledge of the existence of the EMS employees' obligations under their Employee Agreements and the Global Code of Conduct, Lehman and Thorium intentionally and unjustifiably interfered with EMS' employee contracts by inducing EMS employees to breach the non-competition, confidentiality and non-disclosure provisions of the Employee Agreements and the confidentiality and outside employment provisions of the Global Code of Conduct.

67

*Ghahary*

350.    Lehman and Thorium caused Ghahary to breach his Employee Agreement and the Global Code of Conduct by soliciting Ghahary to be employed by Thorium and perform work competitive to the work he was responsible for performing at EMS, while employed by EMS, in violation of the non-competition restrictive covenant in Ghahary's Employee Agreement and the outside employment restriction in the Global Code of Conduct.

351.    Lehman and Thorium further caused Ghahary to breach his Employee Agreement and the Global Code of Conduct by soliciting Ghahary to share EMS' confidential and trade secret information with Thorium in violation of the confidentiality clauses to which Ghahary agreed.

352.    Ghahary breached his EMS Employee Agreement and the Global Code of Conduct by performing work for Thorium competitive to his work for EMS and by sharing EMS' confidential and trade secret information, including a PowerPoint containing confidential and proprietary EMS information, with Thorium at Lehman and Thorium's request.

*Vladimirov*

353.    Lehman and Thorium caused Vladimirov to breach his Employee Agreement and the Global Code of Conduct by soliciting Vladimirov to be employed by Thorium and perform work competitive to the work he was responsible for performing at EMS, while employed by EMS, in violation of the non-competition restrictive covenant in Vladimirov's Employee Agreement and the outside employment restriction in the Global Code of Conduct.

354.    Lehman and Thorium further caused Vladimirov to breach his Employee Agreement and the Global Code of Conduct by soliciting Vladimirov to share EMS' confidential

and trade secret information with Thorium in violation of the confidentiality clauses to which Vladimirov agreed.

355.   Vladimirov breached his EMS Employee Agreement and the Global Code of Conduct by performing work for Thorium competitive to his work for EMS and by sharing EMS' confidential and trade secret information, including, on information and belief, the source code for Conversen, with Thorium at Lehman and Thorium's request.

*Jakober*

356.   Lehman and Thorium caused Jakober to breach her Employee Agreement and the Global Code of Conduct by soliciting Jakober to perform work for Thorium competitive to the work she was responsible for performing at EMS, while employed by EMS, in violation of the non-competition restrictive covenant in Jakober's Employee Agreement and the outside employment restriction in the Global Code of Conduct.

357.   On information and belief, Lehman and Thorium further caused Jakober to breach her Employee Agreement and the Global Code of Conduct by soliciting Jakober to share EMS' confidential and trade secret information with Thorium in violation of the confidentiality clauses to which Jakober agreed.

358.   Jakober breached her EMS Employee Agreement and the Global Code of Conduct by performing work for Thorium competitive to her work for EMS and, on information and belief, sharing EMS' confidential and trade secret information with Thorium at Lehman and Thorium's request.

*Frisch*

359.   Lehman and Thorium caused Frisch to breach his Employee Agreement and the Global Code of Conduct by soliciting Frisch to perform work for Thorium competitive to the

work he was responsible for performing at EMS, while employed by EMS, in violation of the non-competition restrictive covenant in Frisch's Employee Agreement and the outside employment restriction in the Global Code of Conduct.

360.    Lehman and Thorium further caused Frisch to breach his Employee Agreement and the Global Code of Conduct by soliciting Frisch to share EMS' confidential and trade secret information with Thorium in violation of the covenant against disclosure to which Frisch agreed.

361.    Frisch breached his EMS Employee Agreement and the Global Code of Conduct by performing work for Thorium competitive to his work for EMS and sharing EMS' confidential and trade secret information with Thorium at Lehman and Thorium's request.

*Thomas*

362.    Lehman and Thorium caused Thomas to breach the EMS Global Code of Conduct by soliciting Thomas to perform work for Thorium competitive to the work she was responsible for performing at EMS, while employed by EMS, in violation of the outside employment restriction.

363.    On information and belief, Lehman and Thorium further caused Thomas to breach the Global Code of Conduct by soliciting Thomas to share EMS' confidential and trade secret information with Thorium in violation of the Global Code of Conduct's confidentiality provisions.

364.    Thomas breached the Global Code of Conduct by performing work for Thorium competitive to her work for EMS and, on information and belief, sharing EMS' confidential and trade secret information, including source code for EMS' Attribution model, with Thorium at Lehman and Thorium's request.

*Cowie*

365.    Lehman and Thorium caused Cowie to breach the EMS Global Code of Conduct by soliciting Cowie to perform work for Thorium competitive to the work he was responsible for performing at EMS, while employed by EMS, in violation of the outside employment restriction.

366.    Cowie breached the Global Code of Conduct by performing work for Thorium competitive to his work for EMS.

*Wan*

367.    Lehman and Thorium caused Wan to breach the EMS Global Code of Conduct by soliciting Wan to perform work for Thorium competitive to the work he was responsible for performing at EMS, while employed by EMS, in violation of the outside employment restriction.

368.    Wan breached the Global Code of Conduct by performing work for Thorium competitive to his work for EMS.

*Behrozi*

369.    Lehman and Thorium caused Behrozi to breach the EMS Global Code of Conduct by soliciting Behrozi to perform work for Thorium competitive to the work he was responsible for performing at EMS, while employed by EMS, in violation of the outside employment restriction.

370.    Lehman and Thorium further caused Behrozi to breach the Global Code of Conduct by soliciting Behrozi to share EMS' confidential and trade secret information with Thorium in violation of the Global Code of Conduct's confidentiality provisions.

371.    Behrozi breached the Global Code of Conduct by performing work for Thorium competitive to his work for EMS and sharing EMS' confidential and trade secret information, including EMS proprietary source code, with Thorium at Lehman and Thorium's request.

*Watkins*

372.    Lehman and Thorium caused Watkins to breach the EMS Global Code of Conduct by soliciting Watkins to perform work for Thorium competitive to the work he was responsible for performing at EMS, while employed by EMS, in violation of the outside employment restriction.

373.    Lehman and Thorium further caused Watkins to breach the Global Code of Conduct by soliciting Watkins to share EMS' confidential and trade secret information with Thorium in violation of the Global Code of Conduct's confidentiality provisions.

374.    Watkins breached the Global Code of Conduct by performing work for Thorium competitive to his work for EMS and sharing EMS' confidential and trade secret information—including EMS source code, a video file capturing details of EMS' confidential Cross Channel Marketing Platform, and documents regarding EMS' attribution model—with Thorium at Lehman and Thorium's request.

*All Employees*

375.    As a result of Lehman and Thorium's intentional and unjustifiable interference with EMS' employees' contracts, Ghahary, Vladimirov, Frisch, Jakober, Thomas, Cowie, Wan, Behrozi and Watkins breached their obligations set forth in the Employee Agreements and/or the Global Code of Conduct.

376.    The actions by Lehman and Thorium were willful, and accomplished by improper motive and through improper means, including but not limited to a motivation and intent to improperly solicit EMS' employees and to use such employees to unfairly compete with EMS in the marketing services industry.  As a result of Lehman and Thorium's tortious interference with EMS' employee contracts, EMS has been injured and faces further irreparable injury.  EMS is

threatened with losing employees, customers, its competitive advantage and goodwill in amounts which are impossible to determine, unless Lehman and Thorium are restrained by order of this Court.

WHEREFORE, Plaintiff EMS prays that the court grant the following relief:

(a)     Permanently enjoin Thorium and Lehman from interfering with EMS' employee contracts.

(b)     Enter judgment against Thorium and Lehman, jointly and severally, in an amount equal to EMS' damages as determined by the Court.

(c)     Increase such judgment by the amount Thorium and Lehman have been unjustly enriched by virtue of their misconduct so that they are disgorged of any unlawful profits.

(d)     Grant such other and further relief as this Court may deem just and appropriate.

### JURY TRIAL DEMAND

EMS hereby demands a jury for all issues so triable.

Respectfully submitted,

/s/ Susan M. Benton
Attorney for Experian Marketing Solutions, Inc.

Susan M. Benton (6182533 IL)
BUTLER RUBIN SALTARELLI & BOYD
70 W. Madison St., Ste. 1800
Chicago, Illinois 60602
sbenton@butlerrubin.com
312-444-9660

Patrick F. Geary (P44322)
Sheila E. Eddy (P76395)
SMITH HAUGHEY RICE & ROEGGE
Attorneys for Plaintiff
100 Monroe Center NW
Grand Rapids, MI 49503-2802
pgeary@shrr.com
seddy@shrr.com
616-774-8000
530102